# CASES DETERMINED

IN

# THE SUPREME COURT,

## JANUARY TERM, 1860.

| 11 | 479 |
| 92 | 355 |
| 14 | 479 |
| 96 | 607 |
| 14 | 479 |
| 110 | 64 |
| 14 | 479 |
| 111 | 112 |
| 14 | 479 |
| 118 | 298 |
| 14 | 479 |
| 131 | 368 |
| 14 | 479 |
| 144 | 14 |

## THE PEOPLE ex rel. WHITNEY v. THE BOARD OF DELEGATES OF THE SAN FRANCISCO FIRE DEPARTMENT.

THE Fire Department of San Francisco, is not a mere voluntary association, but is a branch of the municipal government of that city.

The decision of the Board of Delegates, in the case of a contested election for Chief Engineer, is a judicial decision, and subject to review by the Courts, on *certiorari*. The extent of such review, is simply to inquire whether the Board has exceeded its jurisdiction.

At common law the writ of *certiorari* tries nothing but the jurisdiction, and, incidentally, the regularity of the proceedings upon which the jurisdiction depends. The review never extends to the merits; upon these the action of the inferior tribunal is final and conclusive.

Our statute is affirmatory of the common law. *People ex rel. Church* v. *Hester*, (6 Cal. 679,) overruled in this respect.

The review by the Courts extends to every issue of law and fact involved in the question of jurisdiction, and not only the record below, but the evidence itself, when necessary to determine a jurisdictional fact, must be returned.

The form and manner of proceeding, before the Board of Delegates, in deciding upon a contested election, is for the Board to determine. And Courts will not undertake to say what is, or is not, sufficient for the Board to proceed upon in the first instance. It is requisite, simply, that at some point of the proceedings, it appear that the case is within the terms of the law.

Where the contest before the Board of Delegates was on the sole ground of illegal votes, the Board had no power to declare the election void. It should have decided for one or the other of the contestants, and issued a certificate accordingly.

Where the Board, instead of so deciding, declared the election void, and ordered a new one, the contestant not objecting, the matter of the contested election must be considered finally dismissed. And the Board ought to declare the result of the first election, according to the returns then made, and issue a certificate of office.

APPEAL from the Twelfth District.

The return to the writ set out in full the proceedings before the Board of Delegates on the contested election.

The Court below dismissed the proceedings.   Relator appeals.

*Hoge & Wilson,* for Appellant.

I.   Is this a proper case for *certiorari?*

The Court below decided that the action of the Board in the matters complained of, was not judicial in its nature and character, and, therefore, was not the subject of review by *certiorari.*

We think it unquestionable, both upon principle and authority, that the Respondents, in the proceeding complained of, were in the exercise of functions so far in their nature judicial as to be the subject of review in this form.   The Practice Act, (Tit. 12, Ch. 1,) regulates the writ of *certiorari,* and the cases in which it will lie.

The relator claims to be Chief Engineer, is in possession of the office, *de jure,* has no appeal, and no other plain, adequate, or complete, remedy, by which he can review these proceedings, by which it is attempted to deprive him of most valuable and important rights and property, except by a resort to the writ of *certiorari.*

Whenever the rights of an individual are infringed by acts of persons clothed with authority to act, and who exercise that authority illegally and injuriously, the person injured may have redress by *certiorari.*

If the act complained of be judicial in its nature and character, it is within the reach and scope of this writ.   (*People* v. *El Dorado County,* 8 Cal. 58; 11 Id. 170; *People* v. *Mayor of New York,* 5 Barb. 45; *Inhabitants of Cushing* v. *Gray et al.* 10 Shep. 9; *Gibbs* v. *County Commissioners,* 19 Pick. 299; *People* v. *Cook,* 14

Barb. 309; *Wildes* v. *Washburn,* 16 Johns. 49; 2 Caine, 179, 181; *Wood* v. *Peake,* 8 Johns. 70; *Scroy* v. *Mayor of New York,* 20 Id. 434; *Weaver* v. *Devendorf et al.* 3 Denio, 117; 3 Johns. Ca. 107; *People* v. *Seaman,* 5 Denio, 409; *Park* v. *City of Boston,* 8 Pick. 225.)

But counsel say, that inasmuch as the law regulating the matter did not give an appeal or writ of error, the Legislature must have intended to vest an exclusive power in the Board of Delegates, and that their action in the premises could not be reviewed in this or any other form. The statute itself, giving the writ of *certiorari,* is a sufficient answer.

It is only when there is no appeal, writ of error, or other plain remedy, that the writ lies. It is to this state of fact, that the Legislature applies this particular remedy. The argument is a perfect *felo de se.*

But even if the Legislature had in so many words made the decisions of the Board of Delegates final and conclusive, the supervisory powers of the Courts of Law would not thereby be taken away. (*Lawton* v. *Commiss'rs of Cambridge,* 2 Caine, 179.)

It is argued that the Fire Department is in the nature of a private incorporation, having no connection with government or its affairs; a mere voluntary association, and like any other such body of men, dealing with their own private affairs, with which the Courts have no concern and have no right to meddle. We do not admit that the result claimed would follow if the premises were correct. On the contrary, in the proper case, whenever any power, in its nature judicial, is illegally exercised, no matter by what body or individual, it is the subject of review and correction by the proper tribunals.

But we do not stop to discuss this view. The whole proposition is false in fact and in law. The Fire Department of San Francisco, so far from being a mere voluntary association, self-existent and independent of law, is the mere creature of the statute. Originally created as a part of the municipal government of San Francisco, by virtue of the powers vested in the city by its charter it has ever since so continued, under every mutation of the city government, subject to its control and direction under the law, sustained from its treasury, and directly responsible to its authority.

The legislation, both State and city, upon the subject of the Fire Department, proves this. (City Charter of 1850, Art. 3, Sec. 1, Sub. 18, Corp. Manual, 7; Charter of 1851, Art. 3, Sec. 13, Manual, 17; City Ordinances, Chap. 5, Tit. 1; Fire Dep't Manual, 68, Chap. 7, Tit. 2, Sec. 11, Tit. 3, Sec. 14, Manual, 80—82; Manual, 84—87, 91—96; Statutes of 1855, Sec. 36, p. 261; Statutes of 1856, Secs. 73, 74, pp. 165, 166; Statutes of 1857, Secs. 4, 7, 11, Subs. 3, 7, 14, pp. 211, 214, 215, 218; Statutes of 1851, Chap. 90, p. 401; Statutes of 1853, Chap. 42, pp. 59, 60; Statutes of 1855, Chap. 180, pp. 223—225; Statutes of 1857, Chap. 90, pp. 88—92; Statutes of 1858, Chaps. 250, 251, Sec. 3, pp. 209, 225.)

The various Acts of the Legislature regulating the Fire Department, all proceed upon the basis, that the department is a branch of the city government, sustained by and responsible to the city. This appears upon the face of the laws themselves.

The whole organization depends upon the action of the city authorities, under the law. There is nothing voluntary in the organization, except this, that no one need join a fire company, except at his own election.

The Fire Department is a public body, created by and under the law. It is a part of the government of the city and county of San Francisco. The Chief Engineer is a public officer, holding his office under, and by virtue of, the law, receiving a salary, like all other city officers, payable out of the City Treasury. The Board of Delegates of the Fire Department of San Francisco have such powers, and such only as the law gives them. Any person injured by their unauthorized and illegal action, may resort to the Courts for redress. (See, by way of analogy, *People* v. *Supervisors El Dorado County*, 11 Cal. 170; *Palmer* v. *Woodbury*, 14 Id.)

II. What does the return bring up, and how far can the Court look into the proceedings and evidence for the purpose of review?

There is considerable conflict of authority upon this question. Whether the relief intended to be given by our statute, is more or less extensive than that afforded by the common law writ, is, perhaps, not very material in this particular case. The common law writ brings up such facts as are necessary to determine the

point of jurisdiction, or other question of law, arising in the course of the proceedings. The Court may examine any errors in the proceedings and judgment appearing on the face of the return. The regularity and legality of the proceedings throughout may be examined, and whether the tribunal could, in point of law and upon the facts, render such judgment as it undertook to render.

The statute writ certainly goes to this extent. We think, the authorities go further. (*Prilling* v. *People*, 8 Barb. 389; *People* v. *Overseers of Ontario*, 15 Id. 286; *People* v. *Goodwin*, 1 Seld. 572; *Bennac* v. *People*, 4 Barb. 164; *Moorewood* v. *Hollister*, 2 Seld. 309; *People* v. *Humphreys*, 24 Barb. 524; *Rathbun* v. *Sawyer et al.* 15 Wend. 451; 6 Id. 566; 10 Id. 181; *Paine* v. *Leicester*, 22 Vt. 22; *People* v. *Soper*, 3 Seld. 428; 13 B. Mun. 515; *People* v. *Turner*, 1 Cal. 155, 187; *Gilbert* v. *Columbia Turnpike Co.* 3 Johns. Ca. 107; 30 Maine, 308; *People* v. *Wilkinson*, 13 Ill. 660; *People* v. *El Dorado County*, 11 Cal. 170.)

III.   On the merits, and looking into the proceedings to the extent we claim the authorities justify, the judgment and decisions of the Board should be reversed.

This Board being a tribunal of limited powers, must show affirmatively, and on the face of their proceedings, that they acted in a case within their powers and within the law. (See the authorities above cited and, also, *Lamar* v. *Com'rs Marshall County*, 21 Ala. 772; *Gilliland* v. *Adm'rs of Sellers*, 2 Ohio, 228.)

1. The original contest of Nuttman was wholly insufficient, and should have been dismissed and disregarded. Admitting his grounds of contest to be all true, they offered no reason for interfering with the returns, much less for setting aside the election. It is not shown or alleged, how the supposed illegal votes were cast, whether for the one or the other of the four candidates voted for.

It is nowhere alleged, that any illegal votes were cast for Whitney. Nor does it appear, that the result of the election was affected, or how it was affected.

The charges presented no case which the Board had a right to investigate. (*People ex rel. Whipley* v. *McKune*, 12 Cal.; *Skerritt's Case*, 2 Parsons' Eq. Cases, 509; *Carpenter's Case*, Id. 589;

*Knapp's Case*, Id. 553; *Parish of Sudbury* v. *Stearns*, 21 Pick. 154; *Ex parte Murphy*, 7 Cow. 153; *Louisville & Nashville R. R. Co.* v. *Com'rs of Co. Court, Davidson*, 3 Liv. Law Mag. 369; *Regina* v. *Clark*, 28 Eng. Law & Eq. 304, 310, 311; *Trustees* v. *Gibbs*, 2 Cushing, 43; *Ex parte Joyce*, 26 Eng. Law & Eq. 158.)

Nuttman, the contestant, in his specifications, does not allege that the votes complained of were given to Whitney, the successful candidate. The charge is, that they were cast against him. This might well be, and yet Whitney be properly elected, as those votes may have been, consistently with the allegation, thrown for the other candidates.

2. The Board of Delegates, under the law, act merely as a Board of Canvassers. If there is no contest presented, they act ministerially alone; they have no power to go behind the returns to hear evidence and to pass upon the validity or invalidity of the returns, or of the votes. Their duty is simply to declare the result of the election from the face of the returns. It is only when there is a contest that their duty becomes in its nature judicial. (*People* v. *Kilduff*, 15 Ill. 492; *Mayo* v. *Freeland*, 10 Mo. 629; *Bacon* v. *York Commissioners*, 26 Maine, 491—498; 25 Maine, 567; 5 Hill, 617, Nelson's Opinion; *People* v. *Van Slyck*, 4 Cow. 297; *People* v. *Vail*, 20 Wend. 12; *People* v. *Furguson*, 8 Cow. 205.)

3. Whitney was *prima facie* elected, and entitled to be so declared, and to receive the certificate. A contest having been presented, the issue, the burden, was on the contestant. If he fails to maintain himself, the contest falls to the ground. By the law he must sustain his grounds of contest by a vote of a majority of the Board. (*McGee* v. *The Supervisors of Calaveras County*, 10 Cal. 376; *Rex* v. *Cambridge*, Vice-Chancellor, 3 Burr, 1659—1663; *People* v. *Scannel*, 7 Cal. 433; *People* v *Kilduff*, 15 Ill. 492; *People* v. *Van Cleve*, 1 Man. Mich. 362; *People* v. *Peck*, 11 Wend. 612; 3 Liv. Law Mag. before cited.)

4. The whole question was finally disposed of by the old Board to whom the returns were made, and whose duty it was, by law, to meet within ten days and declare the result. They, by a solemn vote, refused to set aside the election, and indefinitely postponed the whole subject.

5. The new Board of Delegates, elected the next year, had

no jurisdiction over the subject matter.  The old Board had finally disposed of it.  There was no contest pending.

6. If the new Board had any jurisdiction over the subject matter, then they proceeded irregularly and illegally.  They gave no notice to the parties interested; heard no evidence; were composed of members who had never heard the evidence as given before the old Board, and attempted to pass upon a question involving the rights and property of the citizen, not before them, and without a hearing of the parties.  (2 Mass. 170, 489 ; 4 Id. 627 ; *Commissioners* v. *Claw et al.* 15 Johns. 537 ; 3 Mass. 188, 229 ; 8 Greenl. 135—137 ; *People* v. *Loper,* 3 Seld. 428.)

7. The Board of Delegates have no power, in any case, to declare an election void and set it aside.

8. The Board of Delegates had no power to pronounce the judgment which they did, either under the allegations or the facts of the case.  There was no allegation or pretense, that the election itself was illegally held, or was void for any cause.  The ground of contest was that illegal votes were cast.  It was not alleged for whom they were cast, nor their number; nor that the result would be changed, nor how it would be changed.

The fact that illegal votes were cast, if admitted, would not vitiate the election.  The person having the majority of the legal votes is entitled to be declared elected.

See the following authorities in addition to those already cited : (*People* v. *Cook,* 14 Barb. 326—328; *Same Case,* 4 Seld. 67; *Strong, Pet.* 20 Pick. 484; *Ex parte Heath,* 3 Hill, 42; *State ex rel. Spence* v. *Judge Ninth Circuit,* 13 Ala. 805; *State ex rel.* v. *Circuit Judge Ninth Circuit,* 328 Id. 31; *People ex rel. Whipley* v. *McKune,* above cited.)

9. The decision of the Judges of the election in receiving or rejecting votes is conclusive in the first instance.  The party alleging illegality must show it by proof, or the decision of the officers of the election will not be disturbed.  (See cases already cited.)

*Eugene Casserly,* for Respondent.

*J. A. McDougall,* of Counsel.

1. The proceedings of the Board of Delegates in this case are not subject to be reviewed in any manner by this Court.

The Fire Department of the city and county of San Francisco is a voluntary body, and, though aimed at the public good, is no necessary or proper part of government, not created by it, but has its rise, maintenance, and power, outside of all government, in the will, the voluntary intelligence, devotion, and energies, of the individual citizen.    The law could no more create the Fire Department of the city of San Francisco, than it could create a church, or than it could create the association of Free Masons or of Odd Fellows.

Because such organizations require and receive from the government encouragement and protection, whether extended in the form of pecuniary aid or of statutory sanction and support—as by some part of the coercive power of the law—it is a grave error to confound them with those bodies which, created by the law, and incapable of existing except from the law, are necessarily limited and controlled in every act and movement by some one of the powers of the government.    It is one thing to be created by government, and another to be recognized, or even regulated, by it.

The Fire Department serves great public uses, it is true, and comes in aid of one of the great ends of government, the security of property, and occasionally of life.    For this reason government and the laws extend to it encouragement and protection, and even a certain amount of pecuniary aid, to enable it to accomplish more effectually its useful purposes.

These are, however, mere incidents and accessories, going only to the greater or less efficiency and energy of the department, and are not essential to its existence.

The fact that certain officers of the department, such as the Chief and Assistant Engineers, the Secretary of the Board of Delegates, and the Bell-Ringers, receive salaries out of the public treasury, is no argument against us.    This is simply one mode in which the government sees fit to aid, out of the public funds, an organization which promotes the public utility.    In the same way, it has aided by grants from the public treasury, Orphan Asylums of the various religious denominations in this State.

Reasoning *a priori*, the above arguments go very far in support of our first proposition.

But when we come to examine the whole history of the Fire

Department of San Francisco, and the history and character of such legislation as has been had on the subject, no room is left for cavil.   It will be found, we think, that the entire spirit and tendency of legislation have been to treat the department as a self-existing and self-governing body in all respects, and to emancipate it as completely as possible from all external supervision or interference.

With this view the Legislature has, among other things, conceded to the Board of Delegates to be chosen in the department by the members of the respective companies, the entire government of the department, legislative and judicial.   This is a power not only unusual and anomalous, but incompatible with the claim set up on the part of the Appellant's counsel.   On the other hand, it is not only consistent with our entire theory of the organization of the department, but is, as we believe, indispensable to its harmonious and effective action.   (See Act of 1850 Incorporating the City of San Francisco, Art 3, Sec. 1, Subd. 18; Amended Charter of 1851, Art. 3, Sec. 13; Corp. Manual of 1853, p. 63; Act of 1855, p 223; Consolidation Act of 1856, Sec. 74, Subd. 17; Act of 1857, p. 88.)

Apart from the reasons growing out of the fundamental principles and organization of such a body, this seems to result conclusively from this single reason, that the law provides for the department a special government composed of a body chosen from the several fire companies, and invested with all the necessary legislative and judicial powers; and that the character of this body and its functions are such, as of themselves almost to preclude the possibility of reviewing its acts by a Court of Law.

This body is the Board of Delegates of the Fire Department of the city of San Francisco, composed of two members elected annually in October from each company in the department; having a President, Secretary, and Treasurer.   (See Act of 1857, Secs. 4, 2, 6, 8, 12.)

Within the jurisdiction granted, this power, like the legislative power, must necessarily be supreme and final.   The only question in each case will be, as in this: "Has the Board decided?   What is its decision?"

This result seems to follow inevitably for various reasons, and among them the following:

1. From the nature and constitution of the Fire Department itself.

2. From the nature and constitution of the Board of Delegates.

This is an anomalous body, chosen not by the whole or any part of the voters as such, directly or indirectly, but by the members of a voluntary organization according to their own laws. It is armed both with judicial and legislative powers, not over the citizens at large, nor any portion of them as such, but over the Fire Department of San Francisco.

3. From the existence of such a body as the general Court of the department.

Why give it judicial functions at all, if its acts are to be reviewed by the Courts of Law?

4. It is not sufficient to say, in reply, that in the present case, the office in controversy, that of Chief Engineer, has a large salary attached to it by law: for many reasons. One is: that every member of the Fire Department has certain immunities granted him by law, as incident to membership, such as exemption from jury and militia duty; which immunities are to many men, especially in business, of considerable pecuniary value. There are also certain minor offices in the department, such as Bell-Ringers, which are salaried.

Many offices, such as Regents of a University, Inspectors of public prisons, etc. are purely honorary. Yet the right to them has often been tried by the Courts.

The Board may by expulsion and in various other ways indirectly decide the right of an Engineer to his office, and thus very effectually dispose of his "right of property."

5. Neither is it conclusive to say that in this case the question is of an "office," nor does it lead us one step towards a solution. The Grand Master of the Free Masons, or of the Odd Fellows, has an "office," but it is an office in and of those particular organizations, and not an office of the government.

6. So as to the argument of counsel, that the action of the Board in this case is judicial and therefore subject to review by *certiorari.*

That it is judicial may be granted without conceding a great deal. Many acts and functions are judicial in the sense that they involve the discretion to determine rights, which neverthe-

less do not come within the scope of a *certiorari*. Such are the decisions made by the proper Board or tribunal within a private or voluntary association; as in this case. It will hardly be contended that a determination by the proper Board of a religious association, or an Odd Fellows' or Masonic fraternity, particularly if especially empowered by law to try and decide the very case in hand, could be reviewed on *certiorari*, merely because it was made in the exercise of a judicial function.

Before it can be reviewed on *certiorari*, the judicial function must be such a one, we think, as the law has intended the Courts should supervise; namely, such a one as is exercised by a tribunal, board, or officer, in some department of government, and in which the citizens at large, as such, or some portion of them, have a direct interest.

In the next place, besides being a judicial function, there must be an excess of jurisdiction in the exercise of it, before it can be reviewed by the Courts. Now, as we have seen, in the determination of any controversy arising within the Fire Department, the Board of Delegates cannot commit any excess of jurisdiction; for the reason that they are specially appointed by law to determine every such case, and are not controlled by any fixed rule of proceeding in the exercise of this large power.

Within their jurisdiction they are the sole judges of the law, the facts, and the mode of proceeding. Upon a review by *certiorari* or otherwise, one thing and but one only, has to be ascertained in the first place—is the case within the jurisdiction of the Board? If it is, there can be no further inquiry.

7. The organization of the New York Fire Department has never differed very widely, and of late years has not differed substantially, it is believed, from that of the San Francisco Fire Department. In a body so old and extensive as the former, embracing at present about one hundred and twenty companies and over six thousand members, controversies of course have not been wanting; some of which, it is well known, have agitated the whole body to the very verge of dissolution. Upon Appellant's theory it might be expected that at least some of these cases would have found their way into the Courts of that State, and resulted in decisions affirming the power of the latter to supervise the decisions of the local tribunal of the New York

32

firemen. It is a most significant .fact, however, that no such case can be discovered in the New York Reports.

Very recently, it is understood, an attempt was made in that city to bring under review by the Courts of Law, a decision of the Court of the department, disbanding two fire companies, Nos. 5 and 16, for insubordination. It was decided, however, that the Courts of Law had no power of this kind, and that the decision of the Fire Board, being in a matter within its jurisdiction, was beyond review.

We have only a verbal report of this case, and have thus far been unable to obtain it in a more authentic form.

From all the foregoing views it results that the only question is:

Has the Board of Delegates decided? What is its decision?

To this we answer in the affirmative.

Appellant's counsel seek to maintain two positions on this point:

1. He argues that the Board, by its action in January, 1858, just after the close of the testimony, dismissed the contest, and decided in Whitney's favor.

This is an extraordinary position.

Three motions were made at that time: 1. To set aside the returns of the election. 2. To declare the result, and issue the certificate to Whitney. 3. To lay the whole matter on the table. On each of these motions the Board stood equally divided, seventeen to seventeen. Then a motion was made to reconsider the last motion, and a motion followed to indefinitely postpone that motion, which prevailed by twenty-four to ten. It is useless to contend that such proceedings as these determined anything. Counsel insists that the Board, in this case, was a judicial body, and was exercising a judicial function. When was it heard of, that a Court decided a case by dividing on it equally? or by laying it on the table? or by postponing it?

The obvious view is, that the three votes taken, which had any tendency towards a decision, were all tie votes, which left the Board in equipoise, and the case still pending and under advisement.

This is all clear on principle. If it were not, the question is

settled by the statute, which requires "a majority" of the Board to decide a contested election. (Act of 1857, Sec. 2.)

The second position taken by counsel is, that, conceding there was no decision by the Board in January, 1858, its proceedings in November, 1858, disposing of the case, were void.

This he puts mainly on the ground that by the expiration of the yearly term of the members composing the Board, for 1857 —1858, that body lost all jurisdiction of the subject.

This appears to us to confound two things, essentially distinct: the Board of Delegates and the individuals, who, from time to time, compose it. The former is a permanent, continuous, legal, body. The latter are constantly changing, not only from one year to another, but from one month to another, in each year. The legal entity is the Board of Delegates.

Viewed as a legislative body, a very different question might be presented, as to the effect of the expiration of the annual term of members upon legislative business before the Board.

It is only as a judicial body we have now to consider it. In that light, before Appellant's counsel can establish his proposition, he must show that a Court having once gained jurisdiction of a case, loses it by a change in the persons of the Judges.

Judicial proceedings in the House of Lords, do not abate by a prorogation or dissolution. (Dwarris on Statutes, 253, 254; and compare *Coles* v. *Trustees of Williamsburg*, 10 Wend. 659.)

II. If, however, the Court shall be of opinion that the proceedings of the Board of Delegates in question are a proper subject of review by this Court, then we propose to show that they are within the jurisdiction of the Board, are lawful, and should be affirmed by this Court.

Upon this branch of our argument we submit the following points and authorities.

1. If this is a case for a *certiorari*, then the function of a writ of *certiorari*, in this State, is the same with that of a common law *certiorari*. (Practice Act, Secs. 459, 462.)

The language of Section 462 is substantially the same with the language in which the function of a common law *certiorari* is stated in *King* v. *Commissioners of Sewers*, 2 Keble, 43, quoted 23 Wend. 287, and *vide Rex* v. *Mosely*, 2 Burr, 1043; see, also,

*People* v. *Hester*, 6 Cal. 680. This case has been overruled on the general point decided; but the views expressed as to the function of our statute *certiorari*, have been left untouched. (Compare, also, *In re Hanson*, 2 Cal. 262; *Chard* v. *Harrison*, 7 Id. 113; *Coulter* v. *Stark*, Id. 244.)

2. A common law *certiorari* tries nothing but the jurisdiction of the inferior body or officer, and the regularity of his or its proceedings in that respect, as presented by the record. (*Birdsall* v. *Phillips*, 17 Wend. 464, 467—469, etc.; *Sampson* v. *Rhinelanders*, 20 Id. 103, and cases cited; *Anderson* v. *Prindle*, Id. 396; *Ex parte Mayor of Albany*, 23 Id. 287, 288; *Stone* v. *New York*, 25 Id. 168, 170, etc.; *Mt. Morris Square*, 2 Hill, 25, and cases cited, 25, 26; and see at large, *Rex* v. *Lloyd*, 2 Strange, 996.)

3. The writ brings up only the record, and not the evidence. (See cases cited under Point 2, and, also, the form of a return to a *certiorari* in *Nichols* v. *Williams*, 8 Cow. 13, approved in 3 Barb. 400; *Greene* v. *Cole*, 2 Saund. 228; Tidd's Forms, 147, etc.)

*A fortiori*, where the writ is, as here, to a body without the ordinary powers to compel or preserve evidence. (*Rex* v. *Lloyd*, 2 Str. 996; 23 Wend. 288, 289.)

4. Even in cases under statutes to that effect, where the Courts look into the merits, the return should state the facts proved, and not the evidence given. (*New Brunswick* v. *Franklin*, 1 Harrison, N. J. 535; *Commonwealth* v. *Walker*, 4 Mass. 556; *Starr* v. *Rochester*, 6 Wend. 566.)

And then the Court will not interfere where there is any proof, however slight, to sustain the decision. (1 Harrison, 535; *Patterson* v. *Ackerman*, 5 Zab. 535.) Return, "enough evidence before me to support the judgment." (*Snow* v. *Perkins*, 2 Gibbs, 238; *People* v. *Overseers of Ontario*, 15 Barb. 293.)

And nothing should be returned except the facts necessary to show the jurisdiction. (*People* v. *Goodwin*, 1 Seld. 572.)

5. Respondents have at all times denied the right of the relator to call for the return of the evidence on a *certiorari*. His counsel, however, insisted on it. To save time, the testimony given was returned as far as it could be collected from the imperfect memoranda within the power of the Board; and in the amended return the facts proved were also returned. Through-

out, the Respondents reserved their right to object to the evidence being considered as a part of the return.

They may, therefore, raise the objection here, and insist before this Court, as they do, that the evidence cannot be looked at for any purpose, except, perhaps, to sustain the jurisdiction of the Board.

6. No written complaint or contest was necessary to give jurisdiction to the Board, or set it in motion. (See Act, etc. of 1857, and compare Secs. 2 and 4.)

A contest may be moved by anybody in or out of the Board, and in any mode, by words or writing, by a motion or a plaint, which will in the judgment of the Board bring the matter fairly before it. It is a summary jurisdiction, called upon to decide promptly and summarily questions, which must be so decided, if the department is to exist.

The *modus operandi* and the decision made are no more subject to be reviewed in the former case provided for than in the latter, in which it is very certain they cannot be.

7. But if one was necessary, Nuttman's complaint was sufficient. (*Rathbun* v. *Sawyer*, 15 Wend. 451, 452.) Or, if not sufficient, was made good by the proof taken without any objection on the relator's part.

It is not a valid objection that the Board had no power to order the election of December, 1858, and that such election was void.

The election of December, 1857, was set aside by the Board of Delegates, and was no election. One of two results followed: either there was a vacancy for the unexpired term, or there was a full term to be filled.

In either case, the election was well held, and the language of the call does not affect the matter. The general provision (Act of 1857, Sec. 2,) covers the latter case, and indeed all other cases which can arise, except that of a vacancy to fill an unexpired term, which is provided for by the Act of April 21, 1858.

The Act of 1855, was, in so many words, repealed by the Act of 1858, April 21.

When the Act of 1855 was repealed, the office which Mr. Whitney claims under it, ceased to exist. The rule is well settled, that by the repeal of the statute creating an office, the

office falls.   It is just as if the Legislature had in express terms abolished the office.   (*Conner* v. *New York*, 2 Sandf. Sup. Ct. 369, etc.)

We deny the argument of the counsel, that failing a new election, Whitney, as the old incumbent, holds over for the full new term.   Such a doctrine is foreign to the whole theory of popular election, and unsound and pernicious in its consequences.   *People* v. *Whitman*, (10 Cal. 38,) it is true favors that view; but that case has never been satisfactory to the profession, and can hardly be considered authority.   The true rule is laid down by Field, J. in his dissenting opinion.

Our conclusion is, that the election of December, 1858, was well called and held, and entitled the successful candidate to the unexpired term of the office.

9.   In our view of this case, it is not important to inquire when the Board of Delegates may be considered as canvassers of an election, and when as a Court to determine judicially a contest respecting it.   If it were, it might be shown that the dividing line between the two functions is not so clear as counsel seem to suppose.   (See Act of 1856, Sec. 2; Act concerning Offices, etc. Comp. Laws, Sec. 28.)   He could not very well maintain his action for the office, or for any right or interest accruing to him from it, as salary, without his certificate.   (*Payne* v. *San Francisco*, 3 Cal. 122, 125—126.)   If the proper Board or officer refused him his certificate, his remedy is by *mandamus*, to obtain it. (*Strong, Pet.* 20 Pick. 496.)

COPE, J. delivered the opinion of the Court—FIELD, C. J. concurring.

This is a *certiorari* granted by the District Court of the Twelfth Judicial District, and directed to the Board of Delegates of the Fire Department of the City and County of San Francisco.   The writ was granted upon the petition of the relator, setting forth that in certain proceedings affecting his right to the office of Chief Engineer of the department, the Board of Delegates had exceeded its jurisdiction, and praying the Court to review the action of the Board in the premises, and to grant such relief as should be deemed just and proper.   The petition represents, among other things, that on the first Monday of December, 1857,

an election was held in the city of San Francisco, in pursuance of an Act of the Legislature of this State, entitled "An Act to regulate the Fire Department of the City and County of San Francisco," approved March, 25, 1857, for the purpose of choosing a Chief and three Assistant Engineers of the department, and that, at such election, the relator was duly elected to the office of Chief Engineer, and was entitled to a certificate from the Board of Delegates of his election to that office. The petition further represents, that it was the duty of the Board of Delegates to declare the result of this election, and to give a certificate of office to the person entitled to the same, but that the Board not only refused to declare the result as required by law, but improperly and without any authority whatever, annulled and set aside the election so far as related to that office, and refused to give a certificate, either to the relator or to any other person. It appears that the Board convened at the proper time, for the purpose of canvassing the returns and declaring the result of the election, and that, before the result was declared, one J. E. Nuttman gave notice of his intention to contest the election of the relator, presenting at the same time, a statement of the grounds relied upon, and claiming that he had received the highest number of legal votes cast at such election for said office, and that he, and not the relator, had been elected and was entitled to the certificate. Upon the reception of this statement, the Board proceeded to investigate the merits of the respective claims of these parties, and failing to arrive at a conclusion in favor of either, terminated the investigation by the adoption of a certain preamble and resolution, the former declaring, in effect, that it appeared from the evidence that no person had been elected to said office, and the latter annulling and setting aside the election. This preamble and resolution stand as the decision and judgment of the Board upon the questions involved. The proceedings before the Board are fully set out in the record, but, in the view we take of the case, a more particular reference to them is unnecessary.

We are asked to review this action of the Board of Delegates; and the first question presented for our consideration is, whether the proceedings of that body are subject to review in any manner by the Courts. If this question be decided in the affirma-

tive, it is admitted that a *certiorari* is the proper remedy. The Practice Act, (Sec. 456,) provides that this "writ shall be granted in all cases where an inferior tribunal, board, or officer, exercising judicial functions, has exceeded the jurisdiction of such tribunal, board, or officer, and there is no appeal, nor, in the judgment of the Court, any other plain, speedy, and adequate, remedy." The negative of this question rests upon the proposition, that the Board of Delegates is not a tribunal exercising judicial functions, within the meaning of the statute. In support of this proposition, it is argued that the Fire Department of San Francisco is a mere voluntary association, indebted for its existence to the free will and patriotic devotion of the people of that city, and independent of legal control in the management of its own affairs, and the regulation of its internal government. This argument is easily answered by a reference to the facts relating to the organization of the department, and its subsequent history. It is not correct that this department is a mere voluntary association, called into being by the free and unaided will of the people, and depending for its existence solely upon the devotion and energy of the persons composing it. It is voluntary to this extent only, that no person is compelled to become a member, and no member is under any legal obligation to continue his membership. Its members may withdraw at pleasure, and by so doing, may, for all practical purposes, break up and destroy its organization. Beyond this, it has none of the attributes of a voluntary association; and to anticipate its practical dissolution by the voluntary withdrawal of its members, would, under any circumstances, be unreasonable. The beneficial character of the institution, and the great public necessity for its existence, are sufficient guarantees that it will never be destroyed by the voluntary action of those most interested in its preservation. The argument based upon the possibility of such an event, is not even plausible. It proves entirely too much. It proves that every public body and tribunal in the State, not supported and maintained by the coercive power of the law, is purely voluntary. It applies with as much force to the different branches of the State Government as to the Fire Department of San Francisco. The coercive principle does not exist in the former any more than it does in the latter. No

person is compelled by force or coercion of the law to serve in a public office; and if every person should refuse to do so, the public business would cease, and the government would be practically dissolved.   Such an event is possible, but does this prove that the institutions of government are merely voluntary ?   The fallacy of the argument is too clearly apparent to require further illustration.

The legislation in reference to this subject, and the action of the local government of the city of San Francisco, establish, beyond all question, that this department was organized in pursuance of legislative authority, and is now, and always has been, a branch of the municipal government of that city.   The Act of April, 1850, incorporating the city, vested in the Mayor and Common Council the power to provide "for the prevention and extinguishment of fires, and to organize and establish fire companies."   The reincorporating Acts of 1851 and 1855, continued in the city government substantially the same powers.   By the Act of 1851, the Common Council was empowered to pass laws "for the prevention and extinguishment of fires, and for regulating firemen;" and by the Act of 1855, authority was given to the same body "to direct and control the Fire Department, and make all needful rules and regulations for its government, not otherwise provided by law."   The Act of 1856, commonly called the "Consolidation Act," by which the previous Acts of incorporation were repealed, and the city and county united under one government, vested in the Board of Supervisors similar powers to those conferred upon the Common Council by the Act of 1855.   The Act of 1857, amendatory of the Consolidation Act, provides that the Chief Engineer of the department shall receive for his services a salary as therein specified—under which provision the present Chief Engineer is entitled to a yearly salary of four thousand dollars, payable from the treasury.   An ordinance organizing this department was passed in July, 1850, in pursuance of the authority vested in the Mayor and Common Council by the Act of April of that year.   This ordinance we have not seen, but it is referred to in a repealing ordinance of 1852, as "an ordinance organizing a Fire Department."   It did not regulate a department already established, but established one which did not previously exist.   The ordinance was repealed

in November, 1852, and another passed upon the same subject. This latter ordinance contained full and ample provisions for the regulation and government of the department, but reserved to the Common Council a supervisory control over its proceedings. It provided for the election or appointment of the officers of the department, and defined their powers and duties. Several of these officers were required, before entering upon the discharge of their duties, to take and subscribe an oath of office. It was made the duty of the Chief Engineer to report to the Common Council at stated periods, the condition and necessities of the department, and various other matters connected with the discharge of his duties. The Engineers of the department have always been regarded as officers of the city government. An ordinance was passed November 4, 1852, providing that "there shall be a Chief Engineer of the Fire Department, and a first, second, and third, Assistant Engineer of the Fire Department, who shall be elected by the members of the said department;", and further providing that "the Chief Engineer of the Fire Department shall receive for his services a yearly salary of three thousand dollars, payable in the same manner as that of the other city officers." It would be useless labor to refer to the subsequent action of the city government in reference to this department. Its policy has always been the same, and in no essential particular has the organization of the department, or its relation to the government of the city, undergone any change. The Act of March, 1857, providing rules and regulations for its government, amounts to little more than a repetition of the provisions of existing ordinances, and does not in any manner affect its connection with the municipal government of the city.

But even if we are mistaken in supposing that this department is the mere creature of the law, and admitting that it is purely a voluntary association, we do not see that the doctrine contended for necessarily follows. We can perceive no rational distinction between creating a body for a public purpose and investing it with judicial powers, and clothing with such powers a body already created and existing independent of legislative action. The only question is, does the body whose acts are to be reviewed, exercise judicial functions under the Constitution and laws of the State? If so, and there is no appeal, nor, in the

opinion of the Court, any other plain, speedy, and adequate, remedy, such acts may be reviewed on *certiorari,* and all inquiry into the creation and organization of such body is irrelevant and immaterial. It is of no consequence how it was created, or by what means it exists; if it is clothed with judicial powers, it must be regarded as a tribunal exercising judicial functions, within the meaning of the statute.

It is not disputed that the controversy before the Board of Delegates was judicial in its nature; and it is conceded that the powers of the Board were sufficient for the determination of all questions involved in the controversy. As these were judicial questions, we must regard the Board itself as exercising judicial functions, and as exercising such functions in subordination and subjection to the control and supervision of the Courts, in the manner provided by law. It would be a reproach to the jurisprudence of the State, if the arbitrary, wanton, and illegal, exercise of such powers were beyond the remedial interposition of the Courts.

Having disposed of this preliminary question, the next inquiry is, to what extent can this Court go in reviewing the proceedings of the Board of Delegates? Section 462 of the Practice Act provides, that " the review upon this writ shall not be extended further than to determine whether the inferior tribunal, board, or officer, has regularly pursued the authority of such tribunal, board, or officer." We have already seen that the writ can be granted only where the jurisdiction of the inferior tribunal has been exceeded; and, taking these two provisions together, it is clear that the Courts are confined to the determination of the question of jurisdiction. Beyond this, they have no right or authority to go; and they have nothing whatever to do with the proceedings before the inferior tribunal, except so far as an exam-. ination of such proceedings is necessary for the determination of this question. Chief Justice Murray suggested, in *People ex rel. Church* v. *Hester,* (6 Cal. 679,) that at common law, the province of this writ is more ample than under our statute, as it is not confined to mere questions of jurisdiction. While we fully agree that, under our statute, the writ has no other effect than to raise the mere question of power, a careful examination of the subject has satisfied us that the learned Judge was impressed with a

very serious mistake in regard to the functions of the writ at common law. We think it is well settled that a common law *certiorari* tries nothing but the jurisdiction, and, incidentally, the regularity of the proceedings upon which the jurisdiction depends. It brings up no issue of law or fact not involved in the question of jurisdiction. Under no circumstances, can the review be extended to the merits. Upon every question, except the mere question of power, the action of the inferior tribunal is final and conclusive. This we understand to be the settled doctrine, both in England and in this country. The provisions of our statute are merely in affirmance of the common law. The nature and effect of the writ remain unchanged. Its functions are neither enlarged nor diminished, and the rules and principles which govern its operation are still the same.

But while it is well settled at common law, and must be regarded as equally so under our statute, that the review upon this writ cannot be extended beyond the question of power or jurisdiction, the authorities are not agreed as to what may be considered by the Court of Review for the purpose of determining this question. It is held in many cases that the record, or where, as in this case, there is technically no record, the proceedings and orders in the nature of a record, can alone be regarded; and that it is not the office of this writ to bring up the evidence even upon a disputed jurisdictional fact. On the other hand, the cases are numerous to the effect that the review may be extended to every issue of law and fact involved in the question of jurisdiction, and that not only the record, but the evidence itself, when necessary for the determination of this question, must be returned. The latter is the more reasonable, and, we think, the true rule. The reasons upon which it is founded are well stated by the Court of Appeals of New York, in the case of *The People ex rel. Bodine* v. *Goodwin,* (1 Selden, 568.) The case arose under a statute of that State, by which the Commissioners of Highways were empowered, under certain circumstances, to lay out and open roads, but were prohibited from opening a road through any building without the consent of the owner. The question was, whether the Court could, upon a common law *certiorari,* review the evidence upon an issue in the case, as to whether the consent of the owner had in fact been obtained; and it was held,

SUPREME COURT—JANUARY TERM, 1860.    501

Whitney *v.* Board of Delegates of the S. F. Fire Department.

that as this was a jurisdictional fact, the existence of which was absolutely essential to give any validity to the proceedings of the Commissioners, the evidence in relation to it was properly returned, and was entitled to be considered. "Neither the Commissioners of Highways," said the Court, "nor the referees on appeal from their decision, have power to lay out a road, public or private, through any building without the consent of the owner. There was a barn standing on the land laid out for the highway in controversy; and unless the owner's consent was given that the highway should be so laid out, the referees in laying it out acted without authority, and their proceedings were void for want of jurisdiction. Inferior magistrates, when required by writ of *certiorari* to return their proceedings, must show affirmatively that they had authority to act; and where, as in the present case, their authority and jurisdiction depend upon a fact to be proved before themselves, and such fact be disputed, the magistrate must certify the proofs given in relation to it, for the purpose of enabling the higher Court to determine whether the fact be established. The decision of the magistrate in relation to all other facts is final and conclusive, and will not be reviewed on a common law *certiorari.* But the main object of this writ being to confine the action of inferior officers within the limits of their delegated powers, the reviewing Court must necessarily re-examine, if required, the decision of the magistrate on all questions on which his jurisdiction depends, whether of law or of fact. The evidence, therefore, to prove the consent of the owner of the land to the laying out of the road was properly stated in the return, and is properly examinable here." In view of the great conflict of authority upon this subject, we content ourselves with the expression of our concurrence in the reasoning and conclusions of the Court in that case.

This brings us to the question of the legality of the action of the Board of Delegates in the contest between Nuttman and the relator, and in setting aside and annulling the election of December, 1857. We have seen that this election was held in pursuance of the Act of March, 1857, regulating the Fire Department of San Francisco; and in determining the question before us, it will be necessary to refer to some of the provisions of this act. The first section of the Act provides that the department

shall consist of a "Chief Engineer, three Assistant Engineers, a President, a Secretary, a Treasurer, a Board of Delegates, and such companies as now compose the same, or as hereafter may be admitted thereto, in accordance with the provisions of this Act." The second section, after providing for an election on the first Monday of December, 1857, for a Chief and three Assistant Engineers, proceeds as follows : "The returns of said election, duly certified, shall be forwarded to the Secretary of the department within five days thereafter, and be by him transmitted to the Board of Delegates, who shall convene within ten days thereafter, and declare the result. The person having the highest number of votes for the office of Chief Engineer, shall be declared elected for the term of three years, or until his successor is elected and qualified. - - - - Contested elections for Chief and Assistant Engineers shall be decided by a majority of the Board of Delegates; and should a tie vote occur for either of said officers, the Board shall, by a majority of its members, determine between, or the rank of the contesting parties." The fourth section defines the powers and duties of the Board of Delegates, and among other things provides that the Board shall examine the returns, and declare the result of all Engineers' elections, and give certificates of office to the persons entitled.

It is contended, that although the Board of Delegates is vested by this Act with authority to hear and determine cases of contested elections arising in the department, it is a tribunal possessing only special and limited powers, and that the grounds and reasons of its action must affirmatively appear in every case, or its proceedings will be absolutely void. It is claimed in this case, that the original contest of Nuttman was wholly insufficient to give the Board jurisdiction, and that, having acquired no jurisdiction at the commencement of the proceedings, its acts throughout were illegal and invalid. It is unnecessary for the determination of this point to advert to the familiar distinction between Courts of general and Courts of limited jurisdiction. The statute confers simply the power to decide, leaving it to the Board to determine the form and manner of proceeding. It is true, a mere arbitrary exercise of this power is not contemplated, and would not be valid. A decision without a trial would be illegal and void; but we cannot undertake

to say what is or is not sufficient for the Board to proceed upon in the first instance. We must leave that matter where the Legislature left it—with the Board itself. The jurisdiction must affirmatively appear, but not necessarily, at any particular point of the proceedings. The rule might be different, if the Legislature, in addition to conferring the power, had also provided the mode of proceeding. If this had been done, the power could be exercised only in the prescribed mode.

But, it is entirely immaterial whether this point is well taken or not. There is another objection which is conclusive of the case, and fatal to the validity of these proceedings. Admitting, that the Board of Delegates had full and complete jurisdiction of the controversy before it, its power extended only to the determination of the questions involved in that controversy. The election was contested solely upon the ground of illegal voting; and it is nowhere shown or pretended, that either of the parties was ineligible, or that the election itself was illegally held, or was void for any cause. Under such circumstances, it was the duty of the Board to ascertain which of the parties had received the highest number of legal votes, and declare the result according to the fact. The decision should have been in favor of one or the other of the contestants, and a certificate of office should have been given in accordance with the decision. We do not see in what manner it was ascertained, or by what right or authority it was determined, that neither had been elected; nor can we discover, from what provision of law was derived the power to annul and set aside the election. It is evident, that one of the parties was elected, and it was the right and duty of the Board to determine which; but the party elected had a vested interest and property in the office, which the Board did not possess the power to defeat or destroy. In determining that neither had been elected, and in annulling and setting aside the election, the Board traveled beyond the issues in the case, and beyond anything which it had the power to determine; and to that extent, its proceedings were without authority, and, therefore, void. We do not decide, that the Board may not, in a proper case, set aside an election. We hold, merely, that this is not such a case; and, in arriving at this conclusion, we in no manner interfere with any right which the Board had to control

the case upon the merits.   If the final action of the Board, however unjust or erroneous, had been confined to the matters in controversy, we would not and could not interfere.   But it was as much an excess of jurisdiction to render a decision outside of the case, as it would have been to decide the case in the first instance without a trial, and without investigation.

The judgment of the Court below is reversed, and the cause remanded for further proceedings, in conformity with this opinion.

On petition to revise the opinion in certain particulars, COPE, J. delivered the opinion of the Court—FIELD, C. J. concurring.

We are asked by Respondent's counsel to revise our opinion, recently delivered in this case, so far at least as to indicate the course to be pursued by the Board of Delegates in its future action upon the subject.   This request is based upon the public importance of the case, and the necessity for an immediate adjustment of the unfortunate difficulties which are distracting and dividing the Fire Department of San Francisco.   Our attention is called to a stipulation in the record, which is supposed to be sufficient to justify us in going to the desired extent.   The existence of this stipulation was not unknown to us, but its object seemed to be to obtain a decision upon the merits of the original controversy, and we held expressly that our supervisory authority did not reach beyond the question of jurisdiction, and that, under no circumstances, could the review be extended to the merits.   The matters we are now asked to pass upon do not, necessarily, or even properly arise in the case, and there are obvious reasons why we should not undertake to determine them.   The principal reason is, that our decision would possess no binding force or effect whatever, and could not be relied upon in any future controversy as a determination of the rights of the parties.   But while we cannot expressly adjudicate these matters, yet, believing that this request originated in a desire to accomplish a speedy settlement of the differences existing in the department, we make a few suggestions which occur to us in connection with this subject.

The first prominent fact to be noticed is, that at the election in December, 1857, the relator was, *prima facie*, duly and legally elected.   He received, as shown by the returns, the highest num-

ber of votes, and if no person had appeared to contest the election, the Board of Delegates would have been compelled to declare the result in his favor.   The Board would have had no discretion in the matter; its duty would have been purely ministerial, and by no act or omission could it have prejudiced the relator, or defeated his rights under the election.   The burden of prosecuting and maintaining the contest devolved, of course, upon the moving party; the relator stood upon his original rights, and the consequence of a failure, either to prosecute or maintain the contest, was necessarily to leave him in possession of these rights.   About this there can be no doubt.   It is by no means clear that when the Board undertook to annul and set aside the election of December, 1857, it had not lost all jurisdiction of the controversy, but however that may be, it is certain that its action at that time, although invalid for the purposes contemplated, was a final dismissal of the matter from the further consideration of that body, and the subsequent course of Nuttman, must be regarded as an acquiescence in such action. How that controversy can be considered as still pending before the Board, or in what manner it can be revived at this late day, we do not see; and we understood the counsel for the Respondent to entertain the view, that the proceedings, so far as the Board is concerned, were finally disposed of.   They say on the first page of their brief, that the real question is, whether the relator, under the election of December, 1857, or John C. Lane, under an election held December, 1858, is Chief Engineer of the department.   The claims of Nuttman were, throughout, entirely ignored, and this, whether it should be decided that the Board had, or had not, in disposing of the matter, exceeded its jurisdiction.   We think, therefore, that the Board should proceed and declare the result of the election in December, 1857, according to the returns, and issue a certificate of office to the party entitled. There is nothing in our former opinion conflicting with this view, and if there are expressions which admit of a different construction, they were used inadvertently, and because it seemed to be conceded that in no event was Nuttman interested in the decision.