[Sac. No. 2237. In Bank.—May 12, 1915.]

GREAT WESTERN POWER COMPANY (a Corporation), Petitioner, v. A. J. PILLSBURY, WILL J. FRENCH, and HARRIS WEINSTOCK, as Members of and Constituting the Industrial Accident Commission of the State of California, Respondents.

CONSTITUTIONAL LAW — ROSEBERRY ACT — JURISDICTION OF SUPREME COURT TO REVIEW.—In the absence of some special constitutional authorization the constitutional jurisdiction of this court cannot be impaired by legislative act, and as there was none such at the time of passage of the so-called Roseberry Act, it is ineffectual to prevent application to this court to exercise its original jurisdiction by way of *certiorari*.

ROSEBERRY ACT—JURISDICTION OF INDUSTRIAL ACCIDENT BOARD.—In order to give the Industrial Accident Board jurisdiction, in addition to other requirements the case must be one "where the injury . . . is not caused by the willful misconduct of the employee," and on *certiorari* this court will review the finding of the board as to the absence of such willful misconduct by which it assumes jurisdiction as a question of law where there is no substantial conflict in the evidence.

ID.—WILLFUL MISCONDUCT.—Where deceased, a lineman in the employ of petitioner, a public service corporation, engaged in generating and distributing electricity, was killed by contact with an electric wire and had neglected to wear rubber gloves at the time of attempting to cut the wire, although he knew the danger to himself from a possible grounding of the current, and knew that rubber gloves would remove all possible danger, and notices requiring the use of such gloves on such work had been posted by the company where its linemen frequented, and foreman had been directed to explain the rules and to see to their enforcement, and deceased had twice been required to wear such gloves, once three days and once an hour and a half before such accident, and such gloves were in the wagon of a helper at the place where the accident occurred, an award by the Industrial Accident Board, supported as to jurisdiction by a finding that the accident was not caused by the willful misconduct of the employee, will be annulled upon review.

APPLICATION for a Writ of Review prayed to be directed against A. J. Pillsbury, Will J. French, and Harris Weinstock, as members of and constituting the Industrial Accident Commission of the State of California.

The facts are stated in the opinion of the court.

Guy C. Earl, and W. H. Spaulding, for Petitioner.

Christopher M. Bradley, and Aaron L. Sapiro, for Respondents.

SLOSS, J.—A writ of *certiorari* was issued by this court, on the application of Great Western Power Company, to review an award of the Industrial Accident Commission, fixing upon said applicant a liability for the death of James Mayfield, one of its employees. The injury to Mayfield, and his resulting death, occurred on October 15, 1913. On that date the "Workmen's Compensation, Insurance and Safety Act" (Stats. 1913, p. 279) had been approved, but it was not yet in force, the final section (92) of the act providing that it should take effect on the first day of January, 1914. And the preceding section (91) specifically provides that the "compensation provisions of the act shall not apply to any injury sustained prior to the taking effect thereof." The relative rights of the employing company and of Mayfield's dependents must, therefore, find their definition in the provisions of the law in force at the time of the injury and death, i. e., the act of April 8, 1911, entitled "An act relating to the liability of employers for injuries or death sustained by their employees, providing for compensation for the accidental injuries of employees, establishing an industrial accident board . . . , etc." (Stats. 1911, p. 796.) In the interest of brevity we shall refer to the two acts by titles popularly applied to them, designating the earlier statute, that of 1911, as the "Roseberry Act," and the later, that of 1913, as the "Boynton Act." Mention should also be made of an act approved June 16, 1913 (Stats. 1913, p. 950). This statute provided that, upon the organization of the Industrial Accident Commission (provided for by the Boynton Act), the powers vested in the Industrial Accident Board (existing under the Roseberry Act) should be performed by said commission.

In this proceeding we are earnestly urged by petitioner to consider and decide a number of constitutional objections to the validity of the Boynton Act. But such inquiry would manifestly be futile and improper if, as appears to be the case, the rights of the parties are fixed, not by the Boynton Act, but by the Roseberry Act. Recognizing the force of this consideration, the petitioner seeks to bring the validity of the

Boynton Act into the field of discussion by the claim that the Industrial Accident Commission, which, as successor to the Industrial Accident Board, undertook to act in this case, owes its existence solely to the terms of the Boyton Act, and can have no legal existence, if that act be void.

The attack on the validity of the Boynton Act is based entirely on the compensation provisions of that law.  The act contains many other provisions.  For example, the commission is given power to make regulations regarding safety devices and other methods of protection, to investigate places of employment, to distribute information regarding the causes and prevention of industrial accidents, and to make annual reports to the governor.  The petitioner has not attacked these parts of the act, and it is difficult to imagine any ground upon which the validity of some of them, at least, could be questioned.  They are easily separable from the rest of the act, and, without regard to the saving clause contained in section 86, subdivision (b) of the act, could be upheld even if the compensation provisions were bad.  We have, then, a validly constituted commission, empowered to apply the Roseberry Act to cases arising before January 1, 1914.  The present case being one of that class, we have here no further concern with the validity of the compensation provisions of the Boynton Act, and will leave the consideration of the constitutional questions presented in that behalf until their determination is called for, as it will be in several cases now pending in this court.

The Roseberry Act is assailed by the petitioner in one particular only.  That act provides that awards or orders of the board may be reviewed by a proceeding' (in the nature, apparently, of a writ of *certiorari*), in the superior court, the determination of that court to be subject to an appeal to the supreme court.  The only purpose of the contention that this provision is invalid is to support the action of the petitioner in seeking relief from this court in the first instance, without prior resort to the superior court.  The writ has been issued by us as an exercise of our original jurisdiction, and the respondents do not question our power to review the award of the commission.  Under these circumstances, there appears to be no occasion for extended discussion of the constitutional point.  Let us say, in a word, that, in the absence of some special constitutional authorization—and there was none such

when the Roseberry Act was passed—the constitutional juris-
diction of this court could not be taken away or impaired by
legislative act.   (*Pacific T. & T. Co.* v. *Eshleman,* 166 Cal.
640, 647, 690, Ann. Cas. 1915C, 822, 50 L. R. A. (N. S.) 652,
137 Pac. 1119, and cases cited.)   The Roseberry Act was not,
therefore, effective to prevent application to this court to
exercise its original jurisdiction by way of *certiorari.*

We are, then, finally brought to a consideration of the
merits of the case.   The Roseberry Act, in providing a system
of compensation for accidental injuries to employees, made
the application of the system elective, so far as both employers
and employees were concerned.   The employers who are sub-
ject to the liability created by the act are those only who,
prior to the accident which gives rise to the claim, "have
elected," by written statement filed with the board, and not
withdrawn, "to become subject to the provisions of this act."
Employees are deemed to have elected to be subject to the
act where the employer, at the time of the accident, has so
elected, and the employee has not, at one of certain times spe-
cified, given notice of his election not to come under the act.
In the case at bar both the employer, Great Western Power
Company, and the employee, Mayfield, were subject to the
provisions of the act.   Where liability for compensation exists
its amount is fixed according to a schedule set forth in sec-
tions 8 and 9 of the act.   The conditions determining the lia-
bility are stated in section 3, as follows: "Liability for the
compensation hereinafter provided for, in lieu of any other
liability whatsoever, shall, without regard to negligence, exist
against an employer for any personal injury accidentally sus-
tained by his employees, and for his death if the injury shall
.approximately cause death, in those cases where the follow-
ing conditions of compensation concur:

"(1) Where, at the time of the accident, both the employer
and employee are subject to the provisions of this act accord-
ing to the succeeding sections hereof.

"(2) Where, at the time of the accident, the employee is
performing service growing out of and incidental to his em-
ployment and is acting within the line of his duty or course
of employment as such.

"(3) Where the injury is approximately caused by acci-
dent either with or without negligence, and is not caused by
the willful misconduct of the employee."

The determination of all disputes and controversies concerning compensation under the act is committed to a board of three members, known as the "Industrial Accident Board." This body has now, as we have said above, been superseded by the "Industrial Accident Commission." After hearing, the board is required to file "(1) its findings upon all facts involved in the controversy, and (2) its award, which shall state its determination as to the rights of the parties." The "findings of fact made by the board acting within its powers" are declared, in the absence of fraud, to be conclusive, and under the review authorized by the act, the award may be set aside "only upon the following grounds: (1) That the board acted without or in excess of its powers. (2) That the award was procured by fraud. (3) That the findings of fact by the board do not support the award." We are not here concerned with the second and third grounds thus specified, and may dismiss from consideration the question whether either of these grounds may properly be brought within the scope of a writ of review. The contention of the petitioner is that the board acted without or in excess of its powers, or, in other words, that it exceeded its jurisdiction.

In the hearing before the commission, it was conceded that Mayfield was, on the fifteenth day of October, 1913, an employee of the petitioner, and that, on that day, while performing service incidental to his employment, he met with an accidental injury which caused his death. The controversy turned entirely on whether the injury was caused by Mayfield's willful misconduct. The commission made its findings in general terms, the one bearing on the point just mentioned being that "the death of said James W. Mayfield was proximately caused by accident and was not so caused by the willful misconduct of such deceased employee."

The petitioner contends that this finding is absolutely without support in the evidence before the commission, and that the award based upon it cannot stand. It is, of course, conceded that in any case in which there is a conflict of evidence, the finding of the commission cannot be inquired into here. This results, not only from the provision of the act that the board's findings of fact shall be conclusive, but from the nature of the writ of review, which searches only the jurisdiction of the inferior tribunal, not errors which it may have committed within its jurisdiction. But when the board has

power to act only upon given facts, and there is no evidence whatever to show the existence of those facts, a finding that they do exist cannot, it is claimed, foreclose inquiry by a court under a writ of *certiorari*. This position is, indeed, not questioned by the respondents, who concede that where the evidence is all one way, and the finding is to the contrary, the question becomes one of law, reviewable in a proceeding like the one before us. And, in thus agreeing, the parties are supported by the general current of authority, including the decisions of this court on the general scope of the writ of *certiorari*, and, as well, a number of rulings of other courts on cases arising under statutes similar to the Roseberry Act. To begin with, it is thoroughly settled that the claim that a finding of a court or jury is without support in the evidence presents a question of law, rather than of fact. (*Herbert* v. *Southern Pacific Co.*, 121 Cal. 229, [53 Pac. 651].) It is only because this issue is one of law that it could be considered on appeal in criminal cases during the period (prior to the adoption of section 4½ of article VI of the constitution) when the appellate jurisdiction, in such cases, was limited to "questions of law alone." (Const., art. VI, sec. 4; *People* v. *Smallman*, 55 Cal. 185; *People* v. *Kuches*, 120 Cal. 566, [52 Pac. 1002].) Where the jurisdiction of a board depends upon the existence of certain facts, the board has jurisdiction to determine whether or not those facts exist (*In re Grove Street*, 61 Cal. 438), and its determination that they exist is conclusive on collateral attack (Id., *People* v. *Los Angeles*, 133 Cal. 338, [65 Pac. 749].) *Certiorari*, however, is not a collateral, but a direct attack (Vanfleet on Collateral Attack, sec. 2), and under this writ the existence of the jurisdictional facts may be a subject of inquiry. To this end the evidence itself may, in proper cases, be brought up for examination. "While the writ of review is not a writ of error, and is not a means by which, as upon appeal, the mere manner of conducting the proceedings, the rulings of the court upon questions of evidence, and other matters within the jurisdiction, involving the merits, however erroneous they may be, can be reviewed, it is, nevertheless, a means by which the power of the court in the premises can be inquired into; and for this purpose the review extends, not only to the whole of the record of the court below, but even to the evidence itself, where necessary to determine the jurisdictional fact." (*Schwartz* v. *Superior*

*Court,* 111 Cal. 106, 112, [43 Pac. 580]; *People* v. *Board,* 14
Cal. 479; *Lowe* v. *Alexander,* 15 Cal. 301; *Blair* v. *Hamilton,*
32 Cal. 49; *Stumpf* v. *Board,* 131 Cal. 364, [82 Am. St. Rep.
350, 63 Pac. 663]; *People* v. *Goodwin,* 5 N. Y. 568.)   The
provision of the Roseberry Act making findings of fact by
the board conclusive, should, we think, be taken to include
findings of jurisdictional facts as well as others.   But a re-
view by a court which shall determine whether the board has
acted in excess of its powers is expressly provided for, and it
should not be held that a review can be avoided by a mere
declaration, unsupported by any evidence, that the jurisdic-
tional facts exist.   Such declaration is to be regarded, not as
a finding of fact, but as an assumption of jurisdiction, based
upon a false or erroneous application of the law.

The question whether the accident was caused by the "will-
ful misconduct of the employee" is one that goes to the juris-
diction of the board, and is therefore open to inquiry on *cer-
tiorari.*   Under the terms of the act, the liability exists only
where there is a concurrence of certain conditions, one of
which is the absence of such willful misconduct.   If the in-
jury occurred through the employee's willful misconduct,
there is no liability, and no power on the part of the board
to assess compensation.   This is the view taken by the supreme
court of Wisconsin, in considering like questions arising under
the workmen's compensation law of that state.   (Wis. Laws,
1911, c. 50.)   The Wisconsin statute furnished the model for
the Roseberry Act.   It contains provisions which are, in sub-
stance, identical with the sections of our law defining the
conditions of liability, and declaring the conclusive character
of the findings of the commission.   The Wisconsin court, in
*Borgnis* v. *Falk Co.,* 147 Wis. 327, 360, [37 L. R. A. (N. S.)
489, 133 N. W. 209, 219], said that "the jurisdiction of the
Industrial Commission to entertain any claim for compensa-
tion under the act rests upon two facts which must exist, viz.:
1. That both employer and employee have elected to come
under the act; and, 2. That the injury was received in service
growing out of or incidental to the employment as the result
of accident, and not of willful misconduct.   The Industrial
Commission must, of course, decide these questions in any case
in which they are raised; but it cannot decide them conclu-
sively, for they are jurisdictional questions on which its right
to act at all depends."   Under statutes of like character, the

decisions of other courts are uniformly to the effect that although findings of fact made by the board or commission are generally binding, they may yet be reviewed as matter of law where absolutely unsupported by the evidence. (*Rakiec* v. *Delaware etc. Co.* (N. J.), 88 Atl. 953; *George* v. *Glasgow Coal Co.* [1909], App. Cas. 123; *M'Caffrey* v. *Great Northern Ry. Co.*, 36 Ir. L. T. Rep. 27; *Fenton* v. *Thorley & Co.* [1903], A. C. 443; *Sexton* v. *Newark Dist. Tel. Co.*, 84 N. J. L. 85, [86 Atl. 450]; *Bryant* v. *Fissell*, 84 N. J. L. 72, [86 Atl. 458]; *Rayner* v. *Sligh Furn. Co.*, 180 Mich. 168, [146 N. W. 665]; *Reck* v. *Whittlesbirger* (Mich.), 148 N. W. 247; *Pigeon* v. *Emp. Liab. Ass. Corp.* 216 Mass. 51, [Ann. Cas. 1915A, 737, 102 N. E. 933]; *In re Herrick*, 217 Mass. 111, [104 N. E. 432].)

There was no substantial conflict in the testimony before the commission. The Great Western Power Company was engaged in the business of generating electricity and distributing it in the city of Sacramento and elsewhere. On November 18, 1911, it filed its election to accept the provisions of the Roseberry Act. James W. Mayfield entered its employ as a lineman in May, 1913. On the date of the accident, both the company and Mayfield were subject to the provisions of the act. Mayfield was about 35 years old in October, 1913. He was a journeyman lineman, skilled and experienced at his trade. On October 15, 1913, Mayfield and one Streepy, a fellow lineman in the employ of the Power Company, were directed by a foreman to ascend a pole, situated on Seventh Street in Sacramento, and to remove two transformers from the top of the pole. The pole was carrying wires transmitting a current of two thousand three hundred volts. Tap wires led from the main lines to the transformers, which were used to reduce the voltage to 220. Streepy pulled the plugs connecting the tap wires to the transformer boxes. Thereupon Mayfield, who was standing on a cross-arm, called to Streepy: "All right, Bill, I am going to cut her," and reached up with his pliers to cut one of the tap wires connected with the main line. In so doing he received the shock which caused his death. Streepy saw him sink, his body being held to the pole by a safety belt which he was wearing. By the time he was lowered to the ground life was apparently extinct.

The pole and appliances of the Power Company had been erected in 1912, and were of standard construction. Near by

was a telephone pole, and a guy wire ran from the telephone pole to the ground. It had sagged and thereby come in contact with a metal brace attached to the cross-arm of the power pole, but Streepy did not observe this, nor, probably, did Mayfield. It was suggested, in the evidence, that the shock to Mayfield had occurred through a "grounding" of the current through this guy wire. There is no danger in touching a high-power wire unless a "ground" is produced; that is to say, unless a circuit is made through the body of the person touching the wire. This "grounding" may occur through the pole itself, if there be moisture in the pole, or in various other ways. Streepy testified that a man may safely cut a high-power wire (or "hot" wire, as it is called) at certain times and places, "unless he comes in contact with a ground or other hot wire," but that a man is never sure whether he is going to get a ground. The great hazard attending this kind of work (on "hot" wires) may be obviated by the wearing of rubber gloves, which afford a perfect protection to the wearer, Mayfield, it is perhaps unnecessary to say, was not wearing such gloves at the time of the accident. In August, 1912, the company had issued to its division superintendents orders that employees should not work on poles or towers carrying live wires without the use of a safety belt, nor "work on live wires of 500 volts to 5000 volts, inclusive, without the use of rubber gloves provided by the company." Violations of these rules were declared to be sufficient cause for dismissal, and the division superintendents were directed to give suitable instructions to members of their divisions. Copies of the rules were posted at Sacramento in places where foremen and linemen reported. The foremen were directed to explain these rules to their linemen and to see to their enforcement. The gloves were supplied by the company, and were on hand ready for use. That Mayfield knew of the rules from the time he entered the company's employ is not open to serious question. Nor can it be doubted that he, an experienced lineman, was fully aware of the hazards involved in work on "hot" wires. But beyond all this, Mayfield had, three days before the fatal accident, and again, only an hour and a half before his death, been required by his foreman to wear the rubber gloves. On the latter occasion, Mayfield had ascended a pole without his gloves, and the foreman, Cleek, directed his attention to the matter, and had the gloves sent up to him. When Mayfield

and Streepy came to the pole on which the accident occurred, they were accompanied by a wagon in charge of a helper. In this wagon were their tools and their rubber gloves. They ascended the pole without taking their gloves.

The failure to use these gloves in working on the hot wires was claimed by the Power Company to constitute willful misconduct on the part of Mayfield. A majority of the commission decided against this claim. Commissioner Weinstock dissented, filing an opinion which, we think, states clearly and convincingly the reasons why a different result should have been reached. From that opinion we quote: "The employer had issued and posted rules expressly enjoining the use of rubber gloves by linemen when working with 'hot' wires, and had furnished such rubber gloves as a part of the equipment of linemen. The foremen were familiar with the rule. The foreman in immediate charge of the work, in which the deceased lost his life, was familiar with the rule. He had instructed the use of the gloves on this sort of work not more than two hours before the deceased lost his life by reason of not using them. It was the duty of the foreman to give this order. It was the duty of the deceased to obey it. It was a deliberate breach of his duty to disobey it. The rule was made and the equipment was supplied to safeguard workmen against unforeseen and hidden dangers such as caused the death of the employee here. Other precautions could be taken, and under the evidence, would be taken against obvious dangers.

"The deceased was a lineman of seasoned experience. The risks of his employment were known to him. He was not only recently advised of, but was perfectly familiar with the necessity of taking the prescribed precaution by using the gloves in the work in which he lost his life. To my mind his misconduct manifested a wanton indifference and a willful disregard of all caution and precaution."

There is little to add to these expressions, based, as they are, upon evidence which is undisputed. The term "willful misconduct" is found in earlier statutes on the same subject. In some of the enactments, as in England, the phrase used is "serious and willful misconduct." Willful misconduct means something more than negligence. It does not include every violation or disregard of a rule. (*Casey* v. *Humphries* (1913),

6 B. W. C. C. 520.)    But it cannot be doubted that a work-
man who violates a reasonable rule made for his own pro-
tection from serious bodily injury or death is guilty of mis-
conduct and that where the workman deliberately violates
the rule, with knowledge of its existence and of the dangers
accompanying its violation, he is guilty of willful misconduct.
(*Brooker* v. *Warner,* 23 L. T. R. 201.)    We shall not under-
take to review the numerous cases cited by the respective
parties.    Each turns upon its own peculiar facts and little
would be gained by a recital of circumstances under which it
may have been held that willful misconduct was, or was not,
shown as matter of law.    In this case we are satisfied that
there was no substantial evidence which, by itself, or with
the aid of fair inference, supports the finding of the commis-
sion.    The grave character of Mayfield's act in violating the
rule is apparent from the nature of the consequences which
would be likely to follow, and in this case did follow, its vio-
lation.    That Mayfield intentionally violated the rule is the
only conclusion that can reasonably be drawn from the evi-
dence.    He knew the rule, he had very recently been reminded
of it, he knew the danger of cutting "hot" wires without rub-
ber gloves, and he knew (and announced) that he was about
to cut the wires.    The only rational interpretation of the evi-
dence is that he preferred to work without the gloves because
(as appears in the testimony) their use is somewhat incon-
venient.    But he did this with full appreciation of what it
involved.

There is no foundation in the evidence for the suggestion
that the company had virtually abrogated the rule by failing
to enforce it.    It is true that no lineman was discharged for
failing to wear gloves, but the testimony already outlined
shows that the foremen insisted upon compliance when they
observed that the rule was disregarded.    The fact that the
telephone guy wire came in contact with the pole is of no
consequence.    The very purpose of the rule was to protect
against unforeseen dangers, arising from unobserved or un-
observable contacts and connections.    The use of rubber gloves
on hot wire work was required, even though no danger was
apparent.    What Mayfield did was to take the chance of vio-
lating the rule.    The chance having turned out unfavorably,
it cannot be said that he was not guilty of willful misconduct

because, under different conditions, he might have escaped injury.

The award under review is annulled.

Shaw, J., Lorigan, J., and Henshaw, J., concurred.

MELVIN, J., concurring.—I concur and I agree in everything in the above opinion the more readily because I believe that it is in perfect harmony with the opinion written by me (but not adopted in its entirety by the majority of this court) in *Del Mar Water, Light & Power Co.* v. *Eshleman,* 167 Cal. 669, [140 Pac. 591, 948]. I endeavored in that opinion to express a belief that the findings of the railroad commission upon the facts underlying its own jurisdiction are subject to review when there is no real conflict of evidence, yet the majority of the court held that we might not question the finding (without which admittedly the commission could not act) that the petitioner was a public utility, based merely upon evidence which, as I endeavored to show, was in no real conflict with the uncontradicted fact that the Del Mar Company was only the incorporated agent of a land company for managing its water department. In the present case that same measure is applied to the findings of the Industrial Accident Commission. I believe that there was no real conflict of evidence in the Del Mar case and that there is none in this. In the case at bar I believe that an excess of jurisdiction by the commission was shown, just as I was convinced that the railroad commission exceeded its jurisdiction in the Del Mar proceeding.

ANGELLOTTI, C. J., dissenting.—I concur in the views expressed in the opinion of Mr. Justice Sloss, except that portion thereof holding that the conclusion of the Industrial Accident Commission that the death of the employee Mayfield was not caused by his own "willful misconduct" is without sufficient legal support in the record. It is admitted that the term "willful misconduct" means something different from and more than negligence, however gross. The term "serious and willful misconduct" has been described by the supreme court of Massachusetts in *In re Burns,* 218 Mass. 8, [105 N. E. 601], as being something "much more than mere negligence or even gross or culpable negligence," and as involving "conduct of

a *quasi* criminal nature, the intentional doing of something either with the knowledge that it is likely to result in serious injury, or with a wanton and reckless disregard of its probable consequences.'' It may be true that the evidence in this case was of such a nature as to show that the deceased was guilty of contributory negligence and it may also be true that a finding by the industrial commission that he was guilty of willful misconduct would have had sufficient legal support in the evidence. But I do not think that the evidence was such as to warrant us in holding that there was not sufficient support therein for the contrary finding that was in fact made—in other words, I do not think that we should hold that such evidence compels the conclusion as matter of law that the death of deceased was caused by his own ''willful misconduct.'' I therefore dissent from the judgment annulling the award made by the industrial commission.

Rehearing denied.