[Civ. No. 4944.  Second Appellate District, Division Two.—March 26, 1925.]

MURIEL STRODE LIEBERMAN et al., Petitioners, v. SUPERIOR COURT OF ORANGE COUNTY et al., Respondents.

[1] PROHIBITION—RIGHT OF APPEAL—INADEQUATE REMEDY—RECEIVERSHIP.—Notwithstanding a right of appeal lies from an order appointing a receiver, in exceptional cases that does not constitute an adequate remedy, in which event a writ of prohibition will issue; and in this proceeding in prohibition instituted as the result of the appointment of a receiver of an oil well and certain property of an oil corporation at the instance of unit holders in said well, and the ejectment of such receiver by a different receiver appointed immediately thereafter in an entirely separate unlawful detainer action instituted by the owner of the land upon which the oil well was situated, the remedy of petitioners (who procured the appointment of the receiver in the unlawful detainer action) by appeal from the order appointing the first receiver did not constitute an adequate remedy.

[2] JUDGMENTS—COLLATERAL ATTACK—JURISDICTION—PRESUMPTION.—The validity of an order or judgment of a court of superior jurisdiction cannot be assailed by collateral attack on the ground that it was made in excess of jurisdiction, unless the lack of jurisdiction appears on the face of the record; in other words, the jurisdiction will be deemed to exist in the face of such attack unless the record affirmatively shows that the tribunal had not jurisdiction to make the order to render the judgment in question.

[3] ID.—RECITAL OF JURISDICTIONAL FACTS — PRESUMPTION.—The rule that, upon collateral attack, a court of superior jurisdiction will

1.   See 22 **Cal. Jur.** 481.
3.   See 15 **Cal. Jur.** 70.

be conclusively presumed to have had jurisdiction to make an order or render a judgment unless the want of jurisdiction appears upon the record, does not apply where the record purports to show what was done for the purpose of acquiring jurisdiction, but in such case it will not be presumed in aid of the court's action that anything additional was done.

[4] ID.—APPOINTMENT OF RECEIVER—JURISDICTIONAL FACTS—RECITALS OF ORDER — NOTICE — PRIOR APPOINTMENT.—Where an order appointing a receiver in an accounting action recites that it is made "upon all the papers and proceedings heretofore served or filed herein" and "on due proof of service of motion and on motion," and the record connected with such order does not show to whom or what notice was given, such order may not be collaterally attacked for want of jurisdiction, predicated upon alleged failure to serve notice of the motion upon petitioners, merely because the record of the appointment of receiver earlier in the action (and who had been discharged upon a finding that necessity for a receiver no longer existed) showed an absence of notice to petitioners of the hearing at which the latter receiver was appointed.

[5] ID.—IMPEACHMENT BY COLLATERAL ATTACK—SCOPE OF RULE.—The rule against the collateral impeachment of judgments applies generally to all varieties of judgments, decrees, or orders made by courts of competent jurisdiction, in all kinds of judicial proceedings, and not merely to judgments.

[6] ID.—PROHIBITION—COLLATERAL ATTACK.—A proceeding in prohibition to prevent a threatened punishment for contempt for violating an order appointing a receiver in an accounting action is a collateral attack upon the order appointing said receiver.

[7] ID.—ERROR—DIRECT ATTACK.—A direct attack on a judicial proceeding is an attempt to avoid or correct it in some manner provided by law; and any proceeding provided by law for the purpose of avoiding or correcting a judgment is a direct attack, which will be successful upon showing the error, while an attempt to do the same thing in any other proceeding is a collateral attack, which will be successful only upon showing a want of power.

---

4.   Conclusiveness of recital in judgment as to service of process where record fails to show proper service, note, Ann. Cas. 1913B, 31.

5.   See 15 R. C. L. 867; 15 Cal. Jur. 45.

6.   See 15 Cal. Jur. 48.

7.   What are collateral attacks upon judgments, note, 23 Am. St. Rep. 104.

Direct as distinguished from collateral attack on judgment, note, Ann. Cas. 1914B, 82.   See, also, 15 R. C. L. 839; 15 Cal. Jur. 46.

[8] ID.—DIRECT ATTACK IN SAME PROCEEDING—MATTERS DEHORS RECORD.—A direct attack upon a judgment usually refers to some proceeding in the action in which it was rendered, either by a motion before the court which rendered it or an appeal therefrom, whereas an attempt to impeach the judgment by matters *dehors* the record is a collateral attack.

[9] CORPORATIONS—APPOINTMENT OF RECEIVER—PROCEEDING BY UNIT HOLDERS IN OIL WELL—EQUITY.—Where the relationship between unit holders in an oil well owned and drilled by a corporation is such that the directors of said corporation owe to said unit holders a duty similar to that owing to the stockholders, and said directors are charged with the duty of administering a trust in which the unit holders are the primary beneficiaries, upon a violation of that trust a court of equity will not deny the appointment of a receiver, at the instance of said unit holders, merely upon the ground that they are not stockholders of the corporation.

[10] ID.—GROUNDS FOR APPOINTMENT OF RECEIVER—SUFFICIENCY OF COMPLAINT.—In an action by said unit holders against said corporation and the directors thereof, ample grounds for the appointment of a receiver are stated, where the complaint alleges, among other things, acts of the directors and of others with whom it is alleged they conspired in .violation of their trust, that said directors, through the conspiracy alleged, are not only allowing the oil well to remain idle and thus to deteriorate in value, with the result that all income of plaintiffs is cut off and in future endangered, and that past profits from their investments have been sequestered and appropriated to unauthorized purposes, thus rendering it impossible for the corporation to carry on to advantage that portion of its business relating to said oil well.

(1) 32 Cyc., p. 619, n. 25.    (2) 34 C. J., p. 540, n. 77.    (3) 34 C. J., p. 551, n. 39.    (4) 34 C. J., p. 549, n. 33.    (5) 34 C. J., p. 515, n. 58.    (6) 34 C. J., p. 522, n. 55.    (7) 34 C. J., p. 520, n. 34, p. 521, n. 52.    (8) 34 C. J., p. 520, n. 38, 43.    (9) 40 C. J., p. 1160, n. 66. (10) 14A C. J., p. 966, n. 4.

PROCEEDING in Prohibition to prevent the Superior Court of Orange County, and R. Y. Williams, Judge thereof, from hearing a contempt proceeding against petitioners. Peremptory writ denied.

10. Misconduct of officers or directors of corporation as ground for appointment of receiver, notes, 17 Ann. Cas. 916; Ann. Cas. 1915B, 581.

Dissensions in management of corporation as ground for appointment of receiver, note, L. R. A. 1918D, 229. See, also, 23 R. C. L. 22; 7 Cal. Jur. 189.

The facts are stated in the opinion of the court.

Roland G. Swaffield and Phil M. Swaffield for Petitioners.

Ben F. Gray, Ben E. Tarver, James L. Davis, James L. Allen and George S. Hupp for Respondents.

WORKS, J.—A. J. Charle, one of the respondents in this proceeding, and others who are also among the respondents, commenced an action in the Superior Court for Orange County, also one of the respondents. In that cause, which will henceforth be called the Charle action, the defendants were a corporation named the Pacific Corporation, its directors, and various other natural persons, including Muriel Strode Lieberman. It was alleged in the complaint in the Charle action that the plaintiffs and a large number of others, about 150 in all, "have purchased an interest in a certain lease and an interest in the production of a certain oil and gas well located on the premises described in said lease, known as Pacific Corporation Oil Well No. 16," which will hereafter be termed the oil well; that the plaintiffs sue for themselves and the others making up the 150 individuals; that certain named defendants, who will henceforth be called the directors, are the directors of Pacific Corporation, which will hereafter be called the corporation; that the corporation "has ceased to function as a corporation, and that" the directors were "its last named officers and directors and by reason thereof and as provided by law became the trustees for" the corporation; that prior to the time the corporation ceased to exist it was the owner and holder of certain oil and mining leases on certain particularly described lands and had drilled thereon the oil well to an approximate depth of 4,000 feet; that thereafter the corporation divided the production of all gas, oil, and other hydrocarbon substances saved or produced from the oil well into small parts or units, each of which represented a 1/2160th interest in and to the production of the well; that these interests were by the corporation and directors sold to plaintiffs at the rate of $100 each; and that prior to the time the corporation ceased to do business it entered into a written contract with the plaintiff Charle for the consideration of $1,000, whereby it agreed to sell to Charle

10/2160th parts of the gross production of all oil, gas, and other hydrocarbon substances produced and saved from the well. A copy of this contract is attached to the complaint as an exhibit. The agreement recites that the corporation owns a certain lease on the real property above mentioned; that the corporation has started the drilling of the oil well on the property, the same having been drilled approximately 4,000 feet and into the oil sand approximately 150 feet; and that it is the desire of the corporation to sell to Charle the 10/2160th parts above mentioned at the rate of $100 for each 1/2160th interest and that Charle desires to purchase the same. After these recitals it is provided in the contract that the corporation does sell to Charle for the $1,000, the receipt of which is acknowledged, the 10/2160th parts mentioned. It is further provided in the contract that the corporation "will continue drilling and such other operations as may be necessary to be done and diligently prosecute the same until the said well is put on production, and producing oil in commercial quantities, or until it is determined by the party of the first part that no oil could be obtained by further drilling on said well." There are other provisions of the contract which need not be stated, as they are not material to a determination of the present appeal. The complaint further alleges that the corporation entered into a contract identical in form with that above mentioned with each of the plaintiffs, whereby they each purchased from the corporation certain of the units above specified and of an identical character with those purchased by Charle, each purchase being for a cash consideration, the amount of which is set forth in the pleading. It is also alleged that like units were sold for similar considerations to the other persons making up the 150 individuals, along with plaintiffs, in whose behalf the action is prosecuted. It is further alleged that the corporation and the directors sold in all approximately 800 of the units. It is averred, also, that the corporation "further agreed to sell and market all oil, gas and other hydrocarbon substances as so produced from said well as aforesaid and after the sale thereof and the deduction of the chargeable proportionate share of each unit or interest in the cost of maintenance, operation, selling and marketing of all oil and gas therefrom, to pay unto each unit holder the balance to which he was entitled as evidenced

by said written agreement''; that the corporation did continue the drilling of the oil well ''until oil and gas were found and discovered in paying quantities, and that said well as aforesaid was properly put upon production for the benefit of unit holders and said corporation as aforesaid''; that the corporation ''failed to carry out the terms of its said contract with these plaintiffs, in that it failed to sell, market and dispose of the oil and gas produced therefrom for the benefit of plaintiffs and other unit holders as provided in said contracts''; that the corporation, the directors, and certain other named defendants ''collogued, confederated, and designedly entered into a conspiracy and did conspire to cheat, wrong, and defraud the plaintiff and said unit holders out of their just rights of and from participating in the returns from the sale of the production'' of the oil well as provided in the contracts already mentioned; that in furtherance of the conspiracy the corporation, the directors, and the other defendants last mentioned turned over unto a certain one of those defendants the management of the oil well and the sale of all oil and gas therefrom; that the defendant last mentioned ''collected large sums of money from sales of oil and gas from said well as aforesaid; that the exact amount to these plaintiffs at this time is unknown''; that the defendant last mentioned ''claims to have disbursed and paid out for the benefit of said unit holders large sums of money, all of which these plaintiffs are without knowledge, information, and belief, and therefore allege that said sums so paid out were not just and correct sums and not claims legally due or owing from'' the oil well, but that those sums were due, if at all, from other wells of the corporation and were debts, if any, of the corporation and not of the plaintiffs or of the oil well; that thereafter and in furtherance of the conspiracy, the defendants who are alleged to have been parties to it turned over the management of the oil well and the proceeds of sales of oil and gas therefrom to two of the conspirators, ''who took charge of the operations of said well and the production thereof and who sold the oil and other products therefrom and received large sums of money from such sales,'' and that during a certain month the two defendants last mentioned collected and received approximately the sum of $24,000, all of which belonged to the unit holders of the oil well; that thereafter

and in furtherance of the conspiracy, "the said defendants
as aforesaid turned over the management of said property
and the sale of all oil and gas, and the proceeds therefrom,"
to a fourth party to the conspiracy, "who took possession
of said property, sold the oil and gas therefrom, and re-
ceived large sums of money from the sales of said oil and
gas" from the oil well, amounting approximately to $125,-
000; that in furtherance of the conspiracy all of the con-
spirators, during four certain months, "received from the sale
of oil and gas so sold from said well as aforesaid large sums
of money, the amount of which at this time is unknown to
these plaintiffs, but plaintiffs allege" that the sum so re-
ceived was approximately $100,000, "and that the defend-
ants nor any of them have rendered any accounts of the re-
ceipts or expenditures of such sum or sums"; that no account
has ever been made to the plaintiffs or to any of the unit
holders in and to the oil well by any of the conspirators
and that each of them "claim to have disbursed and paid
out for the benefit of said unit holders large sums of money,
all of which these plaintiffs are without knowledge, in-
formation, and belief, and therefore allege that some of said
sums so paid out were not just and correct sums and
not claims legally due and owing from" the oil well, but
that those sums were due, if at all, from other wells of the
corporation and were debts, if any, of the corporation and
not of the plaintiffs or of the unit holders of the oil well;
that the conspirators "have collected and received from the
sale of oil and gas from said well since the same has been
put upon production, the total amount" of $250,000, and
that the conspirators have applied said sums to the use and
benefit of the corporation and of themselves, "which sum or
sums as so applied greatly exceed the proportion due the said
defendants as unit owners or otherwise, or to which they
or either of them were or are entitled, and which was and
is the property of plaintiffs and other unit holders"; that
one of the named natural person defendants has in his pos-
session approximately $10,000 "as funds received from the
sale of the units or interests to the unit holders in the pro-
duction of said corporation, and of the sale of oil and gas
from said well or otherwise, all of which is the property of
the unit holders and defendant corporation"; that the con-
spirators "continue to collect the proceeds from the sale of

oil and gas and other commodities from the said well, and appropriate the same to their own use greatly in excess of their proportion to which they or either of them are entitled, all to the detriment of the business of" the oil well, "the interests and lawful rights of these plaintiffs, and other holders of units" in the oil well; that "at this time there is no one in authority to act for said corporation, or the unit holders" of the oil well, and that on a certain day the oil well was "closed down and not permitted to flow or is not at this time being pumped nor is said well allowed to produce oil and gas"; that the oil well "is not being cared for; that the production of said well is not being conserved but is allowed to go to waste; and the business of" the oil well "and the property and production thereof is being lost and destroyed; that the unit holders and plaintiffs herein have been and are now being sued in the courts of this state for claims and obligations claimed to be due from these plaintiffs as unit holders, all of which plaintiffs are without any information or belief as to the legality thereof, and that unless a receiver be appointed, said well will deteriorate and become a total loss to plaintiffs and the unit holders in and to said well, and said unit holders will sustain irreparable losses and injury"; and that to conserve the production of the oil well to the plaintiffs and the assets of the unit holders in and to the well, and their interests in and with the corporation, it will be necessary that a receiver be appointed to take charge of and manage the business and conserve the production of the oil well. The complaint closes with a prayer for an accounting of the business of the oil well "from the commencement thereof of all moneys received and paid out by said defendants and each and all of them in relation thereto"; that "a receiver of said property and business be appointed with the usual powers"; that the defendants be enjoined from interfering with the moneys, credits, properties, or effects of the oil well; that the property of the oil well "and the holdings in connection therewith, both real and personal, be sold and the debts and liabilities, if any, be paid, and that the surplus thereof, if any, be divided among the unit holders according to their respective interests therein," and that the plaintiffs be granted such further relief as to the court may seem just and equitable.

Upon the allegations of this complaint respondent court appointed one Ben E. Tarver a receiver for the purpose of taking charge of the property mentioned in the pleading, as well as of all the appurtenances, assets, and books of account pertaining thereto. The order appointing the receiver also directed him to operate the oil well and make sale of the oil produced therefrom.

After Tarver had entered upon the duties of his receivership, Muriel Strode Lieberman, one of the defendants in the Charle action, but not one of the alleged conspirators mentioned in the complaint therein, commenced a certain unlawful detainer action in the superior court for Los Angeles County. The subject of this action was the real property described in the complaint in the Charle action, and upon which the oil well was situated. In the unlawful detainer action the Los Angeles County court appointed one James M. Clune a receiver to take possession of the real property described in the complaint in both actions. After Clune had qualified as such receiver, he, one Howard Murche, and Roland G. Swaffield, an attorney for plaintiff in the Los Angeles County action, according to the allegations in a certain contempt proceeding now to be mentioned, forcibly ejected Tarver from his possession of the oil well as receiver in the Charle action. Proceedings were then instituted in the Orange County court for the purpose of punishing petitioners in this proceeding for contempt of court in invading the alleged possession of the court through its receiver. Thereupon petitioners filed their petition here for a writ of prohibition to prevent the Orange County court from meting out the punishment for contempt, on the ground that the order appointing Tarver receiver was void, and an alternative writ issued. Return was made by demurrer to the petition.

[1] It is contended by respondents that petitioners have an adequate remedy in the ordinary course of law by appeal from the order of the Orange County court appointing Tarver and that they cannot therefore have the writ of prohibition. A question akin to the one here suggested has lately been passed upon by us in *Campbell* v. *Superior Court,* 67 Cal. App. 728 [228 Pac. 354]. There the writ of prohibition was sought to prevent the appointment of a receiver, and in denying the writ on the ground that the petitioner

would have an adequate remedy without resort to the extraordinary powers of the court if a receiver were appointed, we said: "If petitioner shall appeal from any order of respondent court appointing a receiver, that order will become innocuous upon the giving of an undertaking for the purpose of staying the operation of the order. The receiver cannot then enter upon the performance of his duties, and, especially, cannot take possession or control over the properties involved in the action, nor exercise dominion over them." In our opinion in that case, however, we quoted an expression from *Jacobs* v. *Superior Court*, 133 Cal. 364 [85 Am. St. Rep. 204, 65 Pac. 826], to the effect that there "might perhaps, be exceptional facts in a case which would call for a writ of prohibition notwithstanding an appeal from an order appointing a receiver." We think those exceptional facts appear in the present case, although we held that they did not appear in *Campbell* v. *Superior Court*. Here the question is not merely whether a receiver designated by an alleged void order shall take, or retain, the possession of property, but in substance at least and in addition to that question, whether another receiver, appointed by another court, shall have that possession in his stead. An appeal from the order appointing Tarver, granting for the sake of argument that an undertaking on the appeal would serve to divest the possession already lodged in him as receiver, apparently would not have the effect to vest the possession in Clune, the receiver named by the Los Angeles County court. At any rate, if it did have that effect, and if Clune should take possession, or, now having possession should retain it, he could maintain such possession only until the appeal were determined if it should so happen that the order appointing Tarver were finally affirmed. In the meanwhile, Clune would have controlled and managed the property during the period without right, a situation which might possibly result in grave consequences, not only upon the score of the accounting then to be required of him, but in the matter of liability upon his bond as receiver, to say nothing of the possibility of questions arising under the law of damages in its various phases. If an appeal from the order appointing Tarver should not so operate as to entitle Clune to take possession or to remain in possession, and the appeal should result in a reversal of that order, then petitioner

Lieberman would have been unduly postponed in her right to have the property in question in both actions lodged and kept in the possession of Clune. We are of the opinion that the exigencies of such a situation cannot, as a matter of law, justly await the determination of an appeal from the order appointing Tarver and the giving of an undertaking to stay the operation of the order. It appears to us, under all the circumstances above stated, and whether the appeal would smother or would protect Clune's right of possession as receiver, that it must be said that the remedy by appeal from the order appointing Tarver is inadequate, considering that question alone as affecting the right to the writ of prohibition.

It is insisted by petitioners that. the order appointing Tarver was void as to them for the reason that it was made without notice to petitioner Lieberman, and without the giving, as required by section 566 of the Code of Civil Procedure in the case of an *ex parte* application for a receiver, of "an undertaking . . . to the effect that the applicant will pay to the defendant all damages he may sustain by reason of the appointment" of a receiver "and the entry by him upon his duties, in case the applicant shall have procured such appointment wrongfully, maliciously, or without sufficient cause." It is to be observed in this connection that the petitioner Lieberman is the only one of the petitioners who was a party to the action in which the appointment of Tarver was made, the other petitioners all having been her agents only, or having acted in the matter constituting the alleged contempt only under the order of the Los Angeles County court appointing Clune receiver. Therefore, if the order appointing Tarver is void as to that particular petitioner on the grounds stated, it is also void as to the other petitioners. The requirement of section 566 is plain, and the enactment is mandatory (*Van Alen* v.. *Superior Court,* 37 Cal. App. 696 [174 Pac. 672]). Does the section apply in the present instance?

The order appointing Tarver recited that "on due proof of service of motion and on motion" of counsel for plaintiff and of counsel for a defendant who appeared at the hearing, "it is ordered" that Tarver be appointed. It is insisted by respondent that this recital cannot be contradicted by petitioner Lieberman in this proceeding and that she cannot be

heard to assert the fact that no notice was given her. It is said that the present assault upon the order is a collateral attack and that the recital is for that reason conclusive. It is also contended that the order is conclusive without the quoted recital, on the ground that on collateral attack the order, having been made by a court of superior jurisdiction, will be indisputably presumed to have been validly made, no lack of jurisdiction to make it appearing on the face of the record. We shall consider these two points in the inverse order, that is, we shall first view the order appointing Tarver as if it contained no recital as to notice. [2] It is the undoubted rule that the validity of an order or judgment of a court of superior jurisdiction cannot be assailed by collateral attack on the ground that it was made in excess of jurisdiction, unless the lack of jurisdiction appears on the face of the record. To put the rule differently, the jurisdiction will be deemed to exist in the face of such an attack unless the record affirmatively shows that the tribunal had not jurisdiction to make the order or to render the judgment in question. This rule is so well established and is so universally understood that we do not scruple to state it without citation of authority. Really our only concern just here is to determine what constitutes the "record" contemplated by the rule in the present instance, and thereafter to ascertain what, if any, showing is made by that record concerning service or lack of service upon petitioner Lieberman of notice of the hearing at which Tarver was appointed. The first branch of this inquiry we shall settle by assumption. We shall concede for the sake of argument, without deciding, that the files of respondent court in the Charle action may be searched for any return or affidavit of service of notice upon petitioner Lieberman, or for any entry or showing by constituted authority that no service was made, and that whatever is found upon that search, added to the text of the order itself, will constitute the record to be examined. What is there before us—and the question brings us to the second branch of the inquiry—as the result of such a search? Upon this head a most peculiar situation in many particulars is shown by the petition for the writ. The Charle action was commenced on March 31, 1924, and on that day a summons was issued and the court made an order to show cause, returnable on April 11th, why a re-

ceiver should not be appointed. This order, as it is averred, was served on a number of the defendants, not including petitioner Lieberman. It is to be understood, however, that the petition does not allege that there is on file any return, or that there is any other record, showing a service of the order on the defendants alluded to, nor is the source given of the information had by petitioners as to the service, but it is alleged only that it was made. On April 11th the court continued the hearing on the order to show cause to April 15th and on that date one Curry was appointed receiver. He thereafter qualified and entered upon the discharge of the duties of his office. On May 2d an *alias* summons was issued in the cause and on the next day it was served on petitioner Lieberman. This was the first service upon her of any process in the action. On June 9th the court made an order determining that Curry had faithfully discharged his duties as receiver, that it was useless longer to continue the receivership, and exonerating Curry's bond given upon qualifying for the office of receiver. On June 11th petitioner Lieberman entered her appearance in the action by filing demurrer to the complaint. The court, on August 12th, made a second order appointing Curry receiver, but he never qualified under that appointment. On September 12th an order was made vacating the second appointment of Curry and appointing Tarver. This is the order to which reference has heretofore so often been made. This last order, in addition to the matter already quoted as to ''proof of service of motion,'' recited that it was made upon ''the summons and complaint in this action and upon all the papers and proceedings heretofore served or filed herein.''

[3] There is an exception to the rule that a court of superior jurisdiction will be conclusively presumed, upon collateral attack, to have had jurisdiction to make an order or render a judgment unless the want of jurisdiction appears upon the record. This variant from the rule is that where the record purports to show what was done for the purpose of acquiring jurisdiction, that is, for instance, shows what service was had as a basis for the order made or judgment rendered, it will not be presumed in aid of the court's action that anything additional was done. It has been tersely stated that ''when the record shows what was done it will not be presumed that something different was

done" (15 Cal. Jur., tit. "Judgments," sec. 151). [4]
It is quite likely that this variant from the general rule
preserving the sanctity of the judgments and orders of
courts of superior jurisdiction from collateral attack would
apply in the present instance if the order to show cause had
been made returnable on September 12th, the day upon which
Tarver was appointed, or if the hearing thereon had been
regularly continued from an earlier return day, fixed in
the order, to that date, and if, in addition, the petition al-
leged that the records of respondent court showed that a
service of the order had been made upon defendants other
than petitioner Lieberman. Under such circumstances it
probably could not be presumed that a service had been made
upon her. But does the limitation upon the rule apply with
the record of respondent court as we actually find it, assum-
ing for the moment that the record shows what the petition
alleges? We think not, for several reasons. In the first
place, we cannot escape the conclusion that the order to
show cause became *functus* upon the day upon which the
first appointment of Curry was made. There was no at-
tempt, by continuance or otherwise, to keep it alive after that
date. In fact, it is doubtful whether it could have been
kept alive, although we need not decide that it could not
have been. The order contemplated a hearing at which a
receiver was to be appointed unless cause should be shown
why the appointment should not be made. Curry was ap-
pointed upon the date to which the return day was extended
by continuance, and we are convinced, on the whole, that the
order to show cause, and all notice given under it, expired
with the making of the order appointing him. To state a
parallel between the particular proceeding now in question
and an action: The court had issued its process, the process
had been served, the parties served had known their day in
court, or could have been present, and the court had pro-
nounced its judgment. It seems certain that no other re-
ceiver could have been appointed later without the service
of other notice, or, in default of such service, without the
giving of the undertaking required by section 566 of the
Code of Civil Procedure. In addition to the showing upon
which this conclusion is reached, we may look to later oc-
currences shown by the record. The receivership of Curry
was terminated upon a finding that the necessity for a re-

ceiver no longer existed, Curry was discharged as receiver, and his bondsmen were exonerated. These conditions surely put an end to all proceedings for the appointment of a receiver under the order to show cause. The notice to the defendants who had been served with the order, which was made nearly six months from the first appointment of Curry, more than three months after the termination of his receivership, and exactly one month after the abortive attempt to appoint him the second time, could not therefore have furnished a basis for the appointment of Tarver, which would have bound even the defendants served. How, then, can it be said, having in mind the variant rule above stated, and overlooking a matter to be mentioned in the next succeeding paragraph, that there is any showing of record of anything done for the purpose of giving notice, to any defendant, of the proceeding or hearing which eventuated in the appointment of Tarver?

We have several times pointed out that there is no allegation in the petition that the record of respondent court in the receivership proceedings showed that service of the order to show cause was made upon any defendant. The pleading merely avers the fact of service upon some of them. Under what we have termed the variant rule, as already stated, it is only when the record of the court actually shows something that was done in an attempt to acquire jurisdiction, that it cannot be presumed that a different thing was done. The petition, then, is utterly insufficient as a basis for the application of the so-called variant rule.

It remains yet to consider the recital in the order appointing Tarver that it was made "upon all the papers and proceedings heretofore served or filed herein." We are of the opinion that it cannot be said that this language was intended to include, or that the court in using it had in contemplation, the service of the order to show cause said to have been made upon defendants other than petitioner Lieberman before the time when Curry was appointed, even if it were alleged that the files of respondent court showed that service was made upon them. This is so because of the considerations to which we have already adverted. The quoted language of the court, being part of the order appointing Tarver, as it was, cannot be so construed as to refer to papers or proceedings filed as precursors to the appointment

of Curry. For the reasons we have stated, such papers or proceedings led up to that appointment only and could have had no efficacy or force after the order appointing Curry was made, and, especially, after his receivership was terminated. Clearly, to our minds, it cannot be assumed that respondent court intended by its order appointing Tarver to refer to that defunct mesne process as a basis for the appointment. It is not to be forgotten, in this connection, that as already pointed out, the petition does not allege that the record in respondent court shows a service of the order to show cause on defendants other than petitioner Lieberman.

It is to be noted, also, that in the language quoted from the order appointing Tarver, set forth in the next preceding paragraph, the reference is to papers or proceedings "served *or* filed." The use of the italicized conjunction makes the expression comport thoroughly with the idea that the court had before it, as a basis for the order appointing Tarver, "papers or proceedings" which were served but which were not filed. This being so, it must be assumed, under the general rule protecting the orders of courts of general jurisdiction from unwarranted collateral attack, that, if the quoted expression related to service at all, the service was made upon all interested parties, including petitioner Lieberman.

On the whole, and for the various reasons which we have considered, we are of the opinion that there was no attempt made by respondent court, in the "record" of the proceeding which ended in the appointment of Tarver, to show anything whatever as to what was done by way of service of process in that proceeding. Therefore, that to which we have constantly referred as the variant rule can have no application.

It will be remembered that thus far, and in reaching the conclusion just announced, we have considered the order appointing Tarver as if the recital, "on due proof of service of motion," were not contained in it. As we have already noted, respondents, in addition to their claims as to the sanctity of the order from collateral attack when considered without the recital, take the ground that the recital itself closes the mouths of petitioners against the contention which they would make to the effect that no notice of the motion which eventuated in the appointment of Tarver was ever served on petitioner Lieberman. This point we need not

decide. Whether we consider the term "service of motion" as sufficiently comprehensive to import a service of *notice* of motion, or whether we do not, we can see nothing in the recital which detracts from the views which we have expressed in our consideration of the order as if it contained nothing upon the subject of service.

[5] Petitioners insist, concerning the rule to the effect that the pronouncements of courts of superior or general jurisdiction are not subject to collateral attack unless the want of jurisdiction appears on the face of the record, that it has no application to orders, but relates only to judgments. This contention is without merit. "The rule against the collateral impeachment of judgments applies generally to all varieties of judgments, decrees or orders made by courts of competent jurisdiction, in all kinds of judicial proceedings" (34 C. J., p. 514). "The rule against collateral attack applies to orders and judgments made by the courts in special proceedings taken before them, although not in the nature of contested actions, or purely *ex parte,* provided the matter involves a judicial determination and carries the sanction of the court's authority" (34 C. J. 517). Leaving these general statements, and looking to adjudications of our own supreme court, the rule has been applied to an order of sale of personal property in a probate proceeding, under a statute providing that the proceedings of probate courts should "be construed in the same manner, and with like intendments, as the proceedings of courts of general jurisdiction" (*Halleck* v. *Moss,* 22 Cal. 266) ; to an order of the probate court determining the amount of a stamp to be affixed to a will upon its being admitted to probate (*Satterlee* v. *Bliss,* 36 Cal. 489) ; to an order made upon proceedings supplementary to execution, requiring a third party to pay to the plaintiff money in his hands which was the property of the defendant in the action (*Bronzan* v. *Drobaz,* 93 Cal. 647 [29 Pac. 254]) ; to an order setting aside a judgment for the purpose of making corrections in it (*Galvin* v. *Palmer,* 134 Cal. 426 [66 Pac. 572]) ; and to a judgment or order admitting a will to probate (*Estate of Ryan,* 177 Cal. 598 [171 Pac. 297]).

[6] Petitioners contend that the attack which they seek to make on the order appointing Tarver is not collateral, but direct. In support of this view they cite Van Fleet

on Collateral Attack, section 2. At the place cited prohibition is stated to be one of the methods by which a direct attack may be launched. Granting what we need not decide, that this text contains a correct statement of the law, it can apply only when the operation of the order or judgment assailed is sought to be prevented by the writ. Here the endeavor is not to halt proceedings under the order appointing Tarver, but petitioners would prohibit a threatened punishment for contempt under a distinct proceeding based upon that order. It has been directly decided that such an attempt is a collateral and not a direct attack (*Frey* v. *Superior Court*, 22 Cal. App. 421 [134 Pac. 733]). Moreover, the present proceeding comes not within the recognized definitions of the term "direct attack." **[7]** "A direct attack on a judicial proceeding is an attempt to avoid or correct it in some manner provided by law. . . . Any proceeding provided by law for the purpose of avoiding or correcting a judgment, is a direct attack which will be successful upon showing the error; while an attempt to do the same thing in any other proceeding is a collateral attack, which will be successful only upon showing a want of power" (Van Fleet on Collateral Attack, secs. 2, 3). The same definition, in effect, will be found in another publication (34 C. J. 520). **[8]** As showing the application of the rule, it has been said: "When we speak of a direct attack upon the judgment we usually refer to some proceeding in the action in which it was rendered, either by a motion before the court which rendered it or an appeal therefrom, whereas an attempt to impeach the judgment of [by] matters *dehors* the record is a collateral attack" (*Parsons* v. *Weis*, 144 Cal. 410 [77 Pac. 1007]). To carry the same idea further, an assault upon an order or judgment by means of the writ of review is a direct attack (*Great Western Power Co.* v. *Pillsbury*, 170 Cal. 180 [149 Pac. 35]). We are satisfied that the attempt here is not directly to render void or to set aside the order appointing Tarver, but merely to collaterally impeach it. Therefore, and notwithstanding what we have already said as to the inadequacy of the right of appeal when considering that question alone as affecting the right to the writ of prohibition, petitioners must find some means other than the present by which to attack the order.

The order is assailed on other grounds. It is contended that the complaint in the Charle action was insufficient as a basis for the appointment of a receiver. This point is divisible into two distinct questions. The first of these is founded upon several decisions of the supreme court, notably *Havemeyer* v. *Superior Court,* 84 Cal. 327 [18 Am. St. Rep. 192, 10 L. R. A. 627, 24 Pac. 121], and *Elliott* v. *Superior Court,* 168 Cal. 727 [145 Pac. 101], the contention of petitioners being that under the complaint the appointment of Tarver was an attempt, at the suit of those who were not stockholders, to deprive the directors of the possession and control of the property of the corporation, a possession and control which are lodged in the directors by law, and to entrust to a receiver the duty of operating it, which duty under the law cannot be taken from the directors. The appointment of receivers of corporations, however, has frequently been made in actions which to our minds are more nearly like the Charle action than are the cases relied upon by petitioners. The views expressed in *Wickersham* v. *Crittenden,* 93 Cal. 17 [28 Pac. 788], *California F. G. Assn.* v. *Superior Court,* 8 Cal. App. 711 [97 Pac. 769], and *Boyle* v. *Superior Court,* 176 Cal. 671 [L. R. A. 1918D, 226, 170 Pac. 1140], seem to uphold the allegations of the Charle complaint as sufficient to support the appointment of a receiver. [9] We need not be concerned over the fact that the plaintiffs in the action were not stockholders of the corporation. The facts alleged in the complaint were such as to show that the directors owed to them a duty similar to that which was owing to the stockholders. The plaintiffs were the beneficial owners of parts of, we might justly say of aliquot shares of, the output from the oil well. Not only were their rights under their contracts somewhat similar to the right to dividends which the stockholders enjoyed under the law, but, in point of priority at least, they were superior to that right. Undoubtedly, the division to be made between the plaintiffs and those situated like them, of their part of the proceeds from the production of the oil well, must from time to time legally have been made before the right of the stockholders to dividends could attach. The directors were, then, charged with the duty of administering a trust in which, so far as the record here discloses, the plaintiffs in the Charle action were the primary beneficiaries. These

considerations bring the action directly within the doctrine of *Wickersham* v. *Crittenden, supra.* It was there held that the right of a stockholder to the appointment of a receiver of a corporation may justly be founded upon the trust relationship existing between stockholders and directors, and the right to a receiver under the complaint there in question was upheld on the ground that the trust so existing had in that case been violated. The allegations in the Charle complaint showed a similar violation of trust. We cannot conceive a state of the law, under the enlightened principles which govern the exercise of the jurisdiction of courts of equity, which would deny the appointment of a receiver, under the allegations of the Charle complaint, merely upon the ground that the plaintiffs were not stockholders of the corporation. The difference between them and the plaintiff in the action which was the subject of consideration in *Elliott* v. *Superior Court, supra,* is at once apparent. Their situation was such as to appeal peculiarly to the ear of the chancellor. What great wrongs might they suffer if the appointment of a receiver were denied them, wrongs which must otherwise in a great measure go unredressed.

[10] The allegations of the complaint in the Charle action are comprehensively set forth in the statement of facts at the outset of this opinion and it is not necessary here to repeat them in considering the point of petitioners which is now under examination, but a few circumstances may be stated to show the similarity of that action with certain features of *Wickersham* v. *Crittenden, supra,* and the two other cases cited with it above. Intrinsically, the relief asked by the plaintiffs was made necessary by the acts of the directors and of those with whom it is alleged they conspired in violation of their trust. No substantial complaint was made against the corporation itself, although some of the allegations were in form directed against that entity. There was no attempt to wind up the affairs of the corporation, but only to dispose of the oil well "and the holdings in connection therewith." On this head it is contended by petitioners that the complaint must be regarded as if the conduct of the oil well were the sole business of the corporation, but we cannot adopt that view. There was no allegation to that effect. Not only so, but there were a few statements in the pleading which aid in justifying a contrary construction.

The oil well was alleged to be known as the corporation's well No. 16, this averment tending in some degree to indicate that the corporation owned other wells. It was also alleged that certain debts paid out of the trust fund in which the plaintiffs were interested were due from other wells of the corporation and were its debts and not those of the oil well. On the whole, then, we cannot accede to the contention of petitioners as to the interpretation which is to be placed upon the complaint in this regard. Pursuing further our endeavor to show features of the Charle action which are similar to those of the cases which we have cited, we observe that the averments of the complaint show by positive and decided allegation that the directors of the corporation, through the conspiracy alleged, are not only allowing the oil well to remain idle and thus to deteriorate in value, with the result that all income of the plaintiffs under their contracts is cut off and the future endangered, but that the past profits from their investments have been sequestered and appropriated. From these particular allegations, which we must upon the demurrer to the petition assume to be true, it is evident that it is impossible for the corporation to carry on to advantage that portion of its business relating to the oil well. The complaint seems to us to state ample grounds for the appointment of a receiver.

The concluding contention of petitioners, the second branch of their point that the complaint in the Charle action was insufficient to justify the appointment of a receiver, is that the suit "is essentially one for money so far as the material allegations of the complaint are concerned." This point has in a large measure been met by what we have already said, but if it is not entirely so covered we now dismiss it with the remark that in our view the complaint will bear no such limited construction as that contended for.

Demurrer sustained. The alternative writ of prohibition is vacated and a peremptory writ is denied.

Finlayson, P. J., and Craig, J., concurred.