# Richmond

## RIVERSIDE AND DAN RIVER COTTON MILLS, INC., ET ALS. V. CHARLES MELVIN THAXTON, ETC.

January 11, 1934.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*Parrish & Butcher,* for the appellants.

*Aiken, Benton & Bustard* and *Martin & Tuck,* for the appellee.

BROWNING, J., delivered the opinion of the court.

Charles Melvin Thaxton was employed by the Riverside and Dan River Cotton Mills, Inc., on April 27, 1932, as an electrician. His superior, in official position, was J. A. Guy, who was the chief electrician and superintendent of electric power and light. The mills maintain light and power lines in the village of Schoolfield, adjoining the city of Danville. Both the light and power lines were strung or carried on the same poles, which were concrete. The light wires carried 110 voltage and the power wires 2,300 voltage. The current for the light wires was con-

trolled by a switch at the power house and that for the power wires by two switches, one of which was situated on Baltimore avenue and is the one with which we have to do in this case.

The evidence tends to show that Thaxton was an experienced and expert electrician. On the day he went to work for his employer his chief, Mr. Guy, instructed him as to his duties as an electrician in line work. The latter, in relation to these instructions, made, as a witness, this statement:

"The day he came to work I went over these switches with him and showed him the places. We went to them and I told him how important it was for him to take it out. The second day—of course, the first thing was to check over the number of lights that were burned out—and the second day from that day, he and I went over to this switch where he went to replace the lights in the village, and he took the switch out and put the key in his pocket, and I went back to the mill.

"Q. Did he seem to understand the necessity for the rule, the reason for it?

"A. Yes, sir.

"Q. What was the reason for it, Mr. Guy?

"A. These are concrete poles, and we would not work them with the current on, the reason being you would get shocked if you undertook it."

And further as to Thaxton having been instructed as to his duties, a witness, J. T. Deaton, who was an electrician for the mills, and working on the outside, testified as follows:

"Q. Did you ever have any occasion to give him any instruction?

"A. One time.

"Q. When?

"A. When he was working on Spencer avenue.

"Q. When was that?

"A. I can't recall the day.

"Q. Can you recall the month?

"A. Some time in May.

"Q. What was he doing?

"A. Hanging a transformer.

"Q. What instructions did you give, Mr. Deaton?

"A. I asked him did he know about the switch. He said he did. I wasn't satisfied and went with him to be sure the switch was out. We went down and the switch was out. I asked if he knew about all the switches, and he said yes, he knew enough to stay in the clear.

"Q. Did he say how he knew about the switches?

"A. He said Mr. Guy told him about all the switches.

"Q. Do you know a rule in your department for electricians working on power lines?

"A. I know it's against the rule for men to work on them while the power is on.

"Q. Is there any specific rule about how to turn the power off?

"A. Yes.

"Q. What is it?

"A. The man that does the work, he pulls his own switch for the village. He has a key that operates the switch, that cuts the power off in the village, and to disconnect from the power house, he calls the power house and tells them to take out the overhead disconnectors, and they all know about that. He waits at the telephone until they do it. The man that does the work pulls the switch himself, does the work, puts it back in, and puts the key in his pocket. That is the rule he works under.

"Q. Why does he put the key back in his pocket?

"A. He puts the key in his pocket for safety. He knows he has the key that operates the switch and no other key operates it. We have only one key to a switch.

"Q. You mean if the key is in his pocket, no one can throw the switch while he is working on the line?

"A. Yes, sir.

"Q. Is that a well-known rule in your department?

"A. Yes.

"Q. Is that the rule you instructed Mr. Thaxton to follow?

"A. Yes, sir.

"Q. Is the rule strictly enforced in your department or not?

"A. It is."

The section of the Workmen's Compensation Law of Virginia involved in this case is as follows:

"Section 14. No compensation shall be allowed for an injury or death due to the employee's wilful misconduct, including intentional self-inflicted injury, or growing out of his attempt to injure another, or due to intoxication or wilful failure or refusal to use a safety appliance or perform a duty required by statute, or the wilful breach of any rule or regulation adopted by the employer and approved by the Industrial Commission, and brought prior to the accident to the knowledge of the employee. The burden of proof shall be upon him who claims an exemption or forfeiture under this section." Acts 1918, ch. 400, section 14.

On the 28th day of May, 1932, Thaxton's duties required him to replace the street lights which had been burned out. His co-worker, in the performance of this duty, was a colored laborer, named Womack. At 7:10 A. M. of this day, as was his duty, he called the power house and directed the disconnectors to be taken out; that is, the light current to be turned off. He held the telephone until he was informed, by the operator of the power house, McNeely, that the disconnectors were out. But on this date Thaxton did not throw the switch on Baltimore avenue, although he went on that avenue, for the purpose of replacing burned out lights, and thus he began to do his work with the high power current on. He replaced five lights and in replacing the sixth one, about three-quarters of a mile from the switch that controlled the power current, his head came in contact with the high tension wire controlled by the Baltimore avenue switch, which he had not thrown or pulled, and immediate death ensued.

Thaxton's dependent was his sister, Miss Carrie Thaxton, who filed her claim under the Workmen's Compensation Act of Virginia, with the Industrial Commission, for compensation, predicated upon her deceased brother's average weekly wage of $13.33. The employer and the insurance carrier pleaded section 14 of the act, known as "wilful misconduct" section, and, upon a hearing, Chairman Nickels, of the Commission, found that Thaxton had been guilty of wilful misconduct and dismissed the claim. This award, however, was reversed on January 16. 1933, by the Commission, Chairman Nickels dissenting.

The evidence shows that the deceased, Thaxton, after the first three days of his employment, was put to work on construction, inside the mills, and this is stressed by the attorneys for the claimant and also by the Commission in its written opinion, as tending to show the unfamiliarity of the deceased with the particular work in which he was engaged when he met his death. Indeed, it was said, he "was engaged on what is described as construction work and did no further electrical work in the village until the day of the fatal accident."

In this connection we note the testimony of J. T. Deaton, electrician, which has already been quoted at some length. So that we know that some time in the month of May he worked on a transformer, which appears to have required the same operation with respect to the switches as did the replacing of burned out lights, and on this occasion, too, he was instructed as to the precise duties which safety made it necessary for him to perform.

It is also urged that the rule regarding the safety methods necessary before working on the poles was promulgated verbally and was not strictly enforced. It is true that the rule was not printed and posted, but that is only one method of notice, and seems not to be obligatory. As to the latter contention, it seems not to be justified by the evidence. Four witnesses, J. A. Guy, J. T. Deaton, Posie Craft and W. F. Cooper, all testified of the existence of the rule and that it was strictly enforced, and this

testimony is uncontradicted. Incidentally, they were all electricians, and all of them were in the employ of the mills.

It appears that, on the morning of the day of the accident, Mr. Guy, the chief electrician, was present when the deceased was leaving the telephone, from directing the operator, at the power house, to disconnect the switches which controlled the street lights, and he, Guy, inquired of him if they had been disconnected and the deceased responded that they had. On cross-examination, Mr. Guy was asked if he had likewise reminded Thaxton of his duty to disconnect or throw the switch at Baltimore avenue, which controlled the village lighting system, and which wires carried the higher voltage power. The witness' response to this inquiry was in the negative. This circumstance is strongly urged in the claimant's favor as tending to show a forgetfulness or failure of duty upon the part of Mr. Guy. To our minds the importance attached to this circumstance is out of proportion to its worth.

It is fairly and readily accounted for in the fact that, in the case of the power house, reliance was to be made upon the performance of a duty by a third person, while in the case of the throwing of the switch at Baltimore avenue the duty was to be performed by Thaxton himself. The inquiry was reasonably made relative to the duty to be done by another at the power house, but it could not have been intelligently asked with respect to the Baltimore avenue switch, when the man was just starting out to engage in his duties in replacing the lights, and was to throw the switch and take out the key and put it in his pocket, *en route*. He had been told, time and again, by two of his superior fellow-servants, and another of the company's electricians, of the existence of the rule, of the importance of heeding it and of the almost inevitable effect of a failure to do so. He had been instructed specifically as to the method of safeguarding himself. In addition, he was an experienced electrician. The inquiry

made by Mr. Guy was doubtless born of a sense of abundant precaution as to an important duty to be done by a third person out of the presence of both Mr. Guy and Thaxton. It is noteworthy that the only infraction of the rule which the evidence discloses resulted in the discharge of the person who had violated it.

The defense of the utter failure of Thaxton to observe the rule for his own safety is found in a bit of the testimony of Womack, his colored helper, who answered the following question as follows:

"Q. When he got up there on that pole on Lee street where he was killed, did you know he was liable to come in contact with the switch controlled from Baltimore street?

"A. It slipped my memory, and his, too."

The witness could, doubtless, answer for his own lapse of memory, but how could he know that there was a similar hiatus in the mind of Thaxton? It is to be observed that Womack had no such hazardous duty as would charge his mind with the effect of the failure of its observance.

Even had Thaxton been partially injured and were alive to testify, would the explanation that his failure to take the precaution involved here was due to a lapse of memory exculpate him from blame which, under the reasonable provisions of the rule, would be fatal to his case? We think not.

In the case of *King* v. *Empire Collieries Co.*, 148 Va. 585, 139 S. E. 478, 480, 5 A. L. R. 193, it was said: "If the employee had knowledge of the statute, or it can be shown that proper steps had been taken to bring home to him notice of it, he cannot recover, for he cannot recover under one statute enacted for his benefit for an injury proximately arising out of the violation of another statute which he has wilfully neglected or refused to obey."

It has been held that a rule promulgated by an employer, under circumstances similar to those here, and in a similar connection, has the effect of a statute.

■ The above case is cited by counsel for the claimant as authority for their position as to the legal significance of the terms "wilful," "wilful failure or refusal" and "wilful misconduct." Of course, what is said in an opinion by the court in a particular case must be viewed in the light of the circumstances incident to the case. The case itself is dissimilar to ours in that the claimant there had no knowledge of the statute which he was alleged to have violated. A clause in the case contains an apt statement with respect to the term "wilful:" "A wilful failure or refusal to perform a duty required by statute refers to a statute which has in some way been brought to the attention of the employee, or of which he had knowledge."

■ It is said by the annotator in a note appended to 23 A. L. R. 1171: "Ordinarily, however, the breach of an express rule or order will be held to be serious or wilful misconduct as a matter of fact, especially if such rule or order was made especially for the safety of the employee."

In *Rowe* v. *Reynolds* (1900), 12 West Australia L. R. 75, cited in 23 A. L. R. 1171 (note), it was said: "It cannot be doubted that a workman who violates a reasonable rule, made for his own protection from serious bodily injury or death, is guilty of misconduct, and that when the workman deliberately violates the rule, with knowledge of its existence and of the dangers accompanying its violation, he is guilty of wilful misconduct." See, also, *Great Western Power Co.* v. *Pillsbury* (1915), 170 Cal. 180, 149 Pac. 35, 9 N. C. C. A. 466.

In the case of *Stockdale* v. *Industrial Commission of Colorado* (1925), 76 Colo. 494, 232 Pac. 669, an employee came to his death by the breaking of a bridge over which he was driving a wagon with a team of horses. He had been warned that the bridge was unsafe and had been forbidden to so use it, under penalty of dismissal. The Industrial Commission made an award in favor of his dependents, which was affirmed by the District Court. It was said, by the Supreme Court of Colorado, at page 670 of 232 Pac., 76 Colo. 494:

"The meaning of the word (wilful) as used in this place is 'with deliberate intent.' If the employee knows the rule, and yet intentionally does the forbidden thing, he has 'wilfully failed to obey' the rule. It is not necessary for the employer to show that the employee, having the rule in mind, determined to break it; it is enough to show that, knowing the rule, he intentionally performed the forbidden act." See, also, *Lobdell Car Wheel Co.* v. *Subielski* (1924), 2 W. W. Harr. (Del.) 462, 125 Atl. 462; *Sloss-Sheffield Steel & Iron Co.* v. *Greer* (1927), 216 Ala. 267, 113 So. 271.

Cases that have been decided by the Virginia Industrial Commission, in which the holdings are appropriate here, are *Smith* v. *Stonego Coke & Coal Co.*, 13 O. I. C. 500; *Agee* v. *Coleman Furniture Co., etc.*, 13 O. I. C. 359; *Hutcheson* v. *Merrimac Anthracite Coal Corp.* 12 O. I. C. 325; *Tate* v. *Blackwood Coal & Coke Co.*, 11 O. I. C. 38; *Hicks* v. *Clinchfield Coal Corp.*, 11 O. I. C. 491; *Young* v. *Virginia Electric & Power Co.*, 9 O. I. C. 558.

In accordance with the views herein expressed, we reverse the award made by the Industrial Commission and hold that the claimant is not entitled to recover.

*Reversed.*